**Larry Wayne THOMAS, Petitioner–Appellant,**

v.

**Susan HUBBARD, Warden, Respondent–Appellee.**

No. 00–17050.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 2001

Filed Dec. 5, 2001

Amended Jan. 22, 2002.

Gilbert Gaynor, Santa Barbara, California, for the petitioner-appellant.

Janis McLean, Deputy Attorney General, Sacramento, California, for the respondent-appellee.

Before: REINHARDT, HAWKINS, and RAWLINSON, Circuit Judges.

REINHARDT, Circuit Judge:

Larry Thomas appeals the district court's denial of his petition for a writ of habeas corpus asserting that his conviction for first degree murder and personal use of a deadly weapon should be reversed because of a number of prejudicial errors. Specifically, he contends that the jury was prejudiced by several confrontation and due process clause violations at trial including: (1) the improper introduction of triple hearsay statements; (2) prosecutorial misconduct in eliciting evidence about the prior use of firearms in violation of an in limine order; and (3) the improper truncation of the cross-examination of the lead investigating officer regarding the attempts of the purported eyewitness (who, according to the defense's theory, was the actual killer) to evade the police. In light of the fact that the prosecution's case was based almost entirely on the eyewitness testimony of a single accusing witness who himself had the opportunity and a possible motive to commit the offense, we hold that collectively the errors require the issuance of the writ.

## A. BACKGROUND

On December 22, 1993, Michael Luke was found stabbed to death in the parking lot of the Cambridge Garden Apartments in Sacramento, California. The police never located the murder weapon and had no physical evidence linking Larry Thomas to the crime. Austin Schwab, the only "eyewitness" to the events and a man who owed money to the deceased, accused Thomas of committing the crime. It was on the basis of this accusation alone that Thomas was arrested and charged with murder.

### 1. LARRY THOMAS'S VERSION OF THE EVENTS

Larry Thomas consistently maintained his innocence throughout the trial and asserted that Austin Schwab, his accuser, had murdered Luke. He described the events as follows. Thomas and Luke both met with Schwab at Schwab's mother's apartment in the Cambridge Garden Apartment complex on the day of Luke's murder. Thomas went to the apartment looking for Schwab because Schwab owed him money from a drug transaction that had occurred earlier in the week. Thomas had given Schwab, a regular supplier, $200 to buy some methamphetamine. Schwab had then disappeared with Thomas's money rather than returning with his drugs. For the next three days, Thomas made periodic visits to Schwab's apartment where he repeatedly found Michael Luke, who was also looking for Schwab because Schwab owed him money.[1] On December 22, 1993, Thomas and Luke each finally located Schwab at the Cambridge Garden Apartments where Schwab's mother lived. After being assured by Schwab that he would meet up with a man that afternoon and would then be able to take care of his

---

1. In fact, the police found a note in Luke's pocket on December 22, 1993 that said: "Austin, we got tired of waiting on you, so we went home. Either have the money or bring it back as soon as possible." The note was signed "Mike." The note was given to Cheryl Luke, the victim's sister. She gave the note to Schwab because he said he'd like it as "something to remember Michael" by. At trial, Schwab could not remember what he did with the note.

debts to both Thomas and Luke, Thomas left the apartment and did not return to the apartment complex that day. Thomas denies that he had anything to do with Luke's death and maintained throughout his trial that Austin Schwab was the murderer.

## 2. AUSTIN SCHWAB'S VERSION OF THE EVENTS

Although Schwab admitted that he had previously been arrested for possession of methamphetamine, he denied ever being a drug user or drug seller and denied that the meeting at his mother's apartment on the day of the murder had anything to do with drugs. Rather, according to Schwab, Thomas and Luke came to his mother's apartment that day because they wanted him to sell a video camera for them. Schwab agreed to try to do so. During the discussion, Thomas twice pulled Schwab aside to express concerns that Luke would cheat him out of his share of the video camera sale profits. After reassuring Thomas, Schwab went to take a shower and Thomas and Luke left. Schwab's mother told him that Luke and Thomas had gotten into a verbal argument before leaving.

Schwab stated that after making some unsuccessful attempts at selling the camera, he returned to the Cambridge Garden Apartment complex where Luke stopped him in the parking lot and requested a ride. As they were pulling out of the lot, Thomas flagged them down and asked Luke to step out of the car to talk. Luke did so. Schwab then saw Thomas stab Luke in the chest using an object in Thomas's right hand. The autopsy showed that Luke was stabbed in the upper left chest, through the heart, with a wound trajectory consistent with a right-handed thrust. Thomas is left-handed while Schwab is right-handed.

According to Schwab, Thomas ran off after stabbing Luke and Luke then got back into the car and began to go into shock. Schwab then drove to his mother's apartment, parked, and went upstairs to call 911. Although he knew Thomas, when the 911 operator asked him who stabbed Luke, Schwab responded by saying "I don't know who the fuck stabbed him." Later in the conversation, Schwab stated that a Cuban looking guy named "Larry" had done it.

While Schwab was upstairs, Renee Ali, a neighbor with first aid training, administered first aid to Luke in the car. She laid him down and applied pressure to the wound with a towel. When Schwab returned, he sat Luke up and kept pulling Ali's hands away from the wound area. He moved her hands toward Luke's stomach claiming that he was doing what the paramedics had instructed him to do. According to the 911 tape, however, the paramedics instructed Schwab to apply "direct pressure" to the wound. Although Luke was still alive when Schwab returned after calling 911, Schwab later told the police that Luke was dead when he came back downstairs.

## 3. THE INVESTIGATION

When the police arrived, Schwab told them that Thomas was the murderer. The police then asked Schwab if he knew of any reason that Thomas might have for killing Luke, but Schwab failed to mention the proposed video camera sale or the conversation that he allegedly had with Thomas earlier that day during which Thomas purportedly twice expressed con-

cern that Luke would cheat him out of his money. The police, not considering Schwab a suspect, did nothing more than conduct a visual search of his car and did not look in the trunk or search his mother's apartment. The police did search Thomas's apartment but did not find the knife. When asked by the police for his address, Schwab said that he lived with his mother even though he actually had a separate apartment nearby.

Thomas was arrested the day after the stabbing. He was on parole at the time and, because of his drug use, was in violation of his parole terms. He later said that he had been hiding from the police because he wanted to be out of jail for the Christmas holiday and that, for that reason, he gave the police a false name when he was arrested. Although Thomas's jacket at the time of his arrest was an exact match for the jacket that Schwab claimed Thomas was wearing at the time of the stabbing, no blood was found on it or on Thomas's pants or shoes. Thomas did admit that he had two knives the day before Luke's death, but he denied having a knife in his possession on the day Luke was killed. Thomas stated that Schwab had tried to sell him a knife the day of the killing.

Deputy Clark Fancher, the deputy sheriff in charge of the investigation, testified that he interviewed Schwab two months after the stabbing. The trial judge refused to allow Fancher to be questioned about any difficulty he had in locating Schwab. During the interview, Schwab did not tell Fancher that on the day of the murder Thomas and Luke had asked him to sell a video camera. Nor did he tell Fancher that Thomas had allegedly expressed concerns that Luke would cheat him out of his share of the proceeds or that Schwab's mother had told him that

Thomas and Luke had quarreled while in her apartment.

## B. ANALYSIS

### 1. STANDARD OF REVIEW

■ We review a district court's decision to dismiss a petition for writ of habeas corpus *de novo. Miles v. Prunty*, 187 F.3d 1104, 1105 (9th Cir.1999). In order to obtain habeas corpus relief, a petitioner must show that the state court erred and that the error was prejudicial because it had a "substantial and injurious effect" on the outcome. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Bains v. Cambra*, 204 F.3d 964, 977–78 (9th Cir.2000). Because Thomas's petition was filed after the effective date of the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), Thomas must show that the state court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or were "based on an unreasonable determination of the facts in light of the evidence presented" in the state courts. 28 U.S.C. § 2254(d).

■ Where, as here, the state court fails to consider, or issues a "postcard denial" of, the petitioner's federal claims, we must conduct "an independent review of the record." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir.2000). Also, as we recently stated in *Fisher v. Roe*, 263 F.3d 906, 914 (9th Cir.2001), "while we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law."

## 2. INDIVIDUAL ERRORS

### a. Triple Hearsay Testimony

Thomas contends that the state's introduction of inculpatory triple hearsay testimony both violated his Confrontation Clause rights and "so infected the trial with unfairness" as to constitute a due process violation under *Donnelly v. De-Christoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). *See also Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir.1998). At trial, defense counsel cross-examined Deputy Clark Fancher, the lead homicide detective, and asked him whether Schwab ever told him that Thomas and Luke had argued during a business negotiation at his mother's apartment earlier that day.[2] Deputy Fancher answered "no." On re-direct examination, the state elicited testimony over Thomas's objection that Schwab did tell Fancher during an out-of-court interview (first level of hearsay) that "a guy" named Nick had told Schwab (second level of hearsay) about a confrontation that Nick apparently observed between Luke and Thomas at a different time on the day of the murder (third level of hearsay). According to Fancher, Schwab told him that Nick said that Thomas had been beaten up by Luke and had then threatened Luke by saying that he "was going home to get his knife," at which point Luke had responded by saying, "Well go home and get your knife then."[3] Defense counsel then objected

2. The following exchange took place during the cross-examination:

Q. Did [Schwab] tell you that, in fact, the victim and Larry Thomas had been together with him talking earlier, were you aware of that?
A. No.
Q. You would have been interested in that, would you not?
A. If, in fact, that occurred.
Q. And if there was, in fact, some sort of business negotiation that took place with Schwab involving both the defendant, Larry Thomas, the victim, you would have been interested in that, would you not?
A. If that was correct.
Q. Now, if there was, in fact, an argument between Larry Thomas and the victim *at this time*, that would have been certainly relevant with respect to motive, et cetera, would it not?
A. If that's correct.
Q. Did he tell you anything like that?
A. No.

(emphasis added).

3. This is a third level of hearsay only with regard to the statements made by Luke since any statements made by Thomas would constitute admissions by a party opponent under Federal Rule of Evidence 801(d)(2). Consequently, statements made by Thomas that were relayed to the jury would be double hearsay statements. Similarly, the statement regarding the fight would be a different degree of hearsay.

The specific testimony at trial was as follows:

Q. Counsel also asked you a lot of questions regarding statement regarding motive or possible reasons for this homicide occurring. Did you ask Austin Schwab if he had any idea why this homicide may have occurred?
A. Yes.
Q. Did he give you a possibility?
MR. DORFMAN [defense counsel]: Objection, hearsay.
MR. SWARTZ [prosecutor]: He's covered this area.
THE COURT: Just a moment. Objection is overruled. Answer the question, please.
Q. (By Mr. Swartz): Go ahead.
A. He made mention of a—may I look at my reports?
Q. Sure. If that refreshes your recollection, go ahead and look at your report. I think maybe on the last page.
A. He said that he didn't really know why Larry had stabbed Mike or what it was over. That was what he said, but he speculated by saying, "I was told by a guy that I know only by the name of Nick that Larry and Mike had gotten into a fist fight earlier in the day. Nick said Larry got beat up by Mike, and Larry told Michael he was going home

again and the trial judge sustained the objection and instructed the jury to disregard the testimony.[4]

■■■ The admission in a criminal proceeding of a hearsay statement that lacks "adequate indicia of reliability" and is made by an out-of-court declarant may be challenged under the Confrontation Clause. *See Idaho v. Wright,* 497 U.S. 805, 814–15, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *United States v. George,* 960 F.2d 97, 99 (9th Cir.1992). A statement does not bear "adequate indicia of reliability" if it does not fall within a "firmly rooted hearsay exception" or have some other "particularized guarantees of trustworthiness." *Wright,* 497 U.S. at 815, 110 S.Ct. 3139; *George,* 960 F.2d at 99. The statements at issue in this case do not fall within a hearsay exception and have no other guarantees of trustworthiness. They are, moreover, highly prejudicial in that they provide evidence that Thomas had a weapon as well as a motive to use it on the victim.

The state contends that the statements were not hearsay because they were not offered for the truth of the matter asserted but to rebut Deputy Fancher's statement on cross examination that Schwab

did not tell Fancher about any arguments between Thomas and Luke. As non-hearsay statements, the state argues, they cannot implicate the Confrontation Clause. The state further argues that the defense opened the door to the statements and cannot now object to their admission. We reject both of the state's arguments.

(1) *Even if the statements are classified as non-hearsay, they are sufficiently prejudicial that the jury would be unable to consider them only for limited purposes and would consider them for their truth in violation of the Confrontation Clause.*

■■■ A hearsay statement is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." *United States v. Pena–Gutierrez,* 222 F.3d 1080, 1086 (9th Cir.2000) (quoting Fed. R.Evid. 801(c)). A statement offered for some purpose other than its truth is classified as a non-hearsay statement. *See id.* The state is correct that, as a general rule, statements introduced for a limited purpose only, and not for the truth of the matter asserted, do not implicate the Confrontation Clause, *see United States v. Inadi,* 475 U.S. 387, 398 n. 11, 106 S.Ct. 1121,

---

to get his knife. Mike said, Well go home and get your knife then. I don't know Nick's last name or where he lives. I will try and contact Nick and will give him your card and have him call you."

4. The following exchange occurred between the lawyers and the court:

MR. DORFMAN: Your Honor, I object on the basis that is double, triple hearsay, speculation of the worse [sic] sort, and ask that the answer be stricken.

MR. SWARTZ: Not offered for the truth, your Honor, just offered in retort to Mr.

Dorfman's questions about his regard about motive and did he interview him, did he share information about that.

MR. DORFMAN: That's—

THE COURT: Hold on just a moment, just a moment. The motion is granted. The answer is stricken from the record. The jury must disregard the last answer.

The court also gave the following general instruction to the jury just before its deliberations: "Do not consider, for any purpose, any offer of evidence that was rejected, or any evidence that was stricken by the Court; treat any such matter as though you have never heard of it."

89 L.Ed.2d 390 (1986); *United States v. Kirk*, 844 F.2d 660, 663 (9th Cir.1988). The jury is ordinarily instructed that it may consider such statements for the limited purpose only and, in most circumstances, we can safely assume that jurors will follow these instructions and not consider the truthfulness of the out-of-court statements. *See, e.g., Greer v. Miller*, 483 U.S. 756, 767 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence....."); *United States v. Kallin*, 50 F.3d 689, 694–95 (9th Cir.1995) (same). There are, however, some cases in which out-of-court statements are so prejudicial that a jury would be unable to disregard their substantive content regardless of the purpose for which they are introduced and regardless of any curative instruction. *See, e.g., United States v. Mayfield*, 189 F.3d 895, 901–02 (9th Cir.1999) (holding that jury could not abide by an instruction to consider an informant's incriminating statements only to show an officer's state of mind while executing a search warrant); *White v. Cohen*, 635 F.2d 761, 762–63 (9th Cir. 1981) (holding that the prejudice flowing from references to unrelated charges against the defendant in a tape that was used for impeachment purposes could not be cured by the court's limiting instruction); *United States v. Caldwell*, 466 F.2d 611, 612 (9th Cir.1972) (describing the jury's inability to follow instruction to consider informant testimony implicating the defendant in a drug conspiracy only for the purpose of showing the informant's relationship with known drug dealers and not as proof of the defendant's guilt). In such instances, the effect of the testimony on the jury is the same as it would be if the statements were admitted for the truth of their contents. Thus, whether or not such statements are classified as hearsay, they may violate the Confrontation Clause. *See Lee v. McCaughtry*, 892 F.2d 1318, 1325 (7th Cir.1990) (noting that "complicating circumstances" may result in a Confrontation Clause violation when non-hearsay is admitted); *cf. Tennessee v. Street*, 471 U.S. 409, 414–15, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) (finding no Confrontation Clause violation but suggesting that the introduction of non-hearsay statements could violate the Confrontation Clause in some circumstances).

The "triple hearsay" statement at issue in this case is precisely the type of statement that a jury would be unable to ignore or to consider for a limited purpose only. The statement describing a physical confrontation between Thomas and Luke in which Luke beat up Thomas on the very day that Luke was killed and reporting that Thomas told Luke after the beating that he was going home to "get his knife" provides the only evidence that Thomas had both a motive to kill Luke and access to the type of weapon used to commit the crime. Evidence of motive, if believed, completes the prosecution's theory of the case by explaining the purpose of and reason for the defendant's actions. Because motive provides the jury with a framework within which to analyze the defendant's purported actions, it is extremely difficult to ignore or disregard evidence of motive once it is presented.

Similarly, evidence regarding the defendant's possession of and implied threat to use a murder weapon, in particular a knife, is "emotionally charged," prejudicial evidence that a jury would likely be unable to ignore. *See, e.g., McKinney v. Rees*, 993 F.2d 1378, 1385–86 (9th Cir.1993) (holding that, where the defendant is accused of murder by stabbing, admission of evidence

that the defendant owned various dagger-type knives is prejudicial error because testimony about knives is emotionally charged and particularly likely to influence a jury, especially in a circumstantial case in which the state is relying on what amounts to a credibility battle between the defendant and an alleged eyewitness). Here, as in *McKinney*, the evidence against the defendant was far from overwhelming and the case essentially came down to a credibility battle between the defendant and an accusing witness. With no physical evidence implicating Thomas and no murder weapon found, it is unreasonable to assume that the jury would be able to ignore the testimony that, after losing a fist fight with the murder victim, Thomas stated that he would go home and get his knife, and that the victim then directly challenged him to do so. Thus, Fancher's testimony about what Schwab told him that Nick said regarding the purported physical and verbal fight between Thomas and Luke violates the Confrontation Clause regardless of the purpose for which it was introduced.[5]

### (2) *Thomas did not open the door to the challenged testimony.*

██ Thomas did not open the door to the "triple hearsay" statement during the cross-examination of Deputy Fancher. Schwab had testified earlier in the trial that Thomas and Luke had had an argument at Schwab's mother's apartment on the day of the murder. This verbal dispute took place, according to Schwab,

when Thomas and Luke came to the apartment to ask him to sell a video camera for them. When Deputy Fancher took the stand, defense counsel questioned him about whether Schwab had ever told him about *that particular argument.* Specifically, defense counsel asked Fancher if Schwab had told him about an argument between Thomas and Luke that took place *during the business negotiation at Schwab's mother's apartment.*[6] The defense did *not* ask Fancher whether Schwab had told him about any other arguments that Schwab may have heard about second-hand from some elusive third-party, perhaps because Schwab did not testify that he had heard about any such other arguments. The defense's questions regarding the argument about which Schwab testified did not open the door to Fancher's testimony regarding other arguments about which Schwab did not testify. *See United States v. Collicott,* 92 F.3d 973, 980–81 (9th Cir.1996) (describing the "opened door" doctrine as not allowing evidence to be admitted if such evidence is not relevant to the "door" that was opened).

### (3) *We need not determine whether this error was harmless or prejudicial.*

The state also asserts that any Confrontation Clause error was harmless. We strongly question this assertion. Were we to resolve the issue, we would, in all likelihood, hold the error, standing alone, to be sufficiently prejudicial to warrant reversal and also hold that the state courts' failure to recognize this error constituted an un-

---

**5.** Given our conclusion that, regardless of its classification for evidentiary purposes, the statement had the practical effect of a hearsay statement, we find it unnecessary to determine whether it constituted hearsay or non-hearsay. We note, however, that the trial

court's ruling striking the statement indicates that it did not accept the State's argument that it was non-hearsay.

**6.** *See* testimony quoted *supra* note 2.

reasonable application of clearly established federal law. *See, e.g., Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Fancher's testimony regarding Thomas's alleged physical and verbal fight with Luke was the only evidence offered by the prosecution that even suggested that Thomas might have had a motive for, and the weapon with which to commit, the crime. We need not further address the prejudice issue, however, given our holding that the cumulative effect of the several serious errors in the case rise to the level of a due process violation. *See* discussion of cumulative error *infra* Section 3.[7]

### b. Prosecutorial Misconduct in Violating in Limine Order

Thomas argues that the prosecutor's attempt to establish that he used a firearm during the commission of a prior offense violated the state court's in limine order and constituted prosecutorial misconduct rising to the level of a due process violation. At trial, Thomas was impeached through questioning about his 1978 first-degree residential burglary conviction, 1978 robbery conviction, 1984 escape from jail conviction, and 1986 robbery conviction. Defense counsel filed a motion in limine prior to trial to exclude reference to the robbery convictions. The following exchange occurred at the motions hearing:

> THE COURT: Well, the complaint [in this matter] simply refers to the two robberies as robberies. There is no reference to either conviction for robbery in a residence or use of a gun. What is it you intend to prove with respect to

the two robbery convictions, Mr. Swartz [prosecutor]?

MR. SWARTZ: I simply intend to ask [defendant], if, and when he takes the stand, have you been convicted of robbery on those two prior—those two separate occasions, residential burglary, as well as escape from jail.

THE COURT: You're just going to identify the robberies as robberies?

MR. SWARTZ: That is correct.

THE COURT: All right. I deny the motion.

Nevertheless, at trial, the prosecutor questioned Thomas as follows:

Q. (By Mr. Swartz): Sir, if we can move onto I believe December 28th or so of 1978, did you plead guilty to a charge of robbery *with a firearm* down in Orange County?

A. Yes, I did.

Q. Do you admit doing that one?

A. Yeah, I did.

Q. Okay. Oh, you did rob someone *with a gun?*

A. I did.

MR. DORFMAN: Objection, form of the question.

THE COURT: Objection sustained. That's an impermissible question, Mr. Swartz.

MR. SWARTZ: Sorry, your Honor.

(emphasis added). The state did not quarrel, either in its written brief or at oral argument, with the state courts' finding of intentional misconduct on the part of the prosecution. Rather, it contended that the issue is procedurally defaulted, and, alternatively, that it does not rise to the level of a due process violation.

---

7. For the same reason, it is unnecessary to decide whether the error regarding Fancher's testimony, standing alone, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868.

■■■■ The state argues that Thomas failed to make a contemporaneous objection to the prosecutor's questions about Thomas's use of a firearm during the commission of a 1978 robbery and thereby procedurally defaulted his claim. We reject this argument. The state may not rely on the contemporaneous objection rule as a basis for procedural default unless that rule is consistently applied in similar circumstances. *See Hathorn v. Lovorn*, 457 U.S. 255, 263, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982) ("State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims."). Under California law, an objection to evidence in the form of a motion in limine is normally sufficient to preserve the issue for appeal even in the absence of a contemporaneous objection at trial. *People v. Morris*, 53 Cal.3d 152, 279 Cal.Rptr. 720, 807 P.2d 949, 969 (1991) ("[W]e hold that a motion in limine to exclude evidence is a sufficient manifestation of objection to protect the record on appeal . . . ."), *overruled in part on different grounds by People v. Stansbury*, 9 Cal.4th 824, 38 Cal.Rptr.2d 394, 889 P.2d 588 (1995); *see also People v. Ramos*, 15 Cal.4th 1133, 64 Cal.Rptr.2d 892, 938 P.2d 950 (1997); *People v. Rowland*, 4 Cal.4th 238, 14 Cal.Rptr.2d 377, 841 P.2d 897 (1992). Therefore, Thomas's motion in limine to exclude testimony about his prior convictions was sufficient to raise and preserve his objection, and he was not required to make a contemporaneous objection at trial.[8]

■■■■ Even if the state's contemporaneous objection rule could otherwise

serve as a procedural bar, it cannot do so here, because the state court failed to rely on the state procedural rule. If a state appellate court overlooks the procedural default and considers an objection on the merits, the state has not relied on the procedural bar and the federal courts may review the claim. *See Panther v. Hames*, 991 F.2d 576, 580 (9th Cir.1993). The state court must "clearly and expressly state[ ] that its judgment rests on a state procedural bar" in order for federal review to be precluded. *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (internal quotations omitted). Here, the California Court of Appeal discussed the issue of procedural default noting that, in the absence of a timely objection, a point is reviewable "only if an admonition would not have cured the harm caused by the misconduct." The court then went on to discuss whether the error was harmless without ever deciding whether an admonition could have cured the harm in this case. In so doing, the court left the resolution of the procedural default issue uncertain rather than making a clear and express statement that its decision was based on a procedural default.

■■■■ In the absence of a procedural bar to our addressing the merits of this claim, we have no difficulty in concluding that the prosecution's introduction of testimony regarding Thomas's use of a gun constituted serious error. The State conceded at oral argument that all of the state courts had found intentional prosecutorial misconduct and did not quarrel with that conclusion. We recognize that Thomas was properly cross-examined about his four prior felony

---

8. Moreover, Thomas's objection to the form of the question may have satisfied the contemporaneous objection requirement. There is no doubt that the court understood the reason for the objection because the judge immediately sustained it stating that it was "an impermissible question."

convictions, and we do not underestimate the forcefulness of that impeachment evidence. Nevertheless, evidence that Thomas used a gun to commit a prior act of violence is prejudicial and evokes a "visceral [reaction] that far exceeds [any] probative value," *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir.1992). In any event, again we need not decide whether an error—this time the prosecutorial misconduct error—would warrant issuance of a writ given the cumulative error holding we announce below.

### c. Truncation of Deputy Fancher's Cross-examination[9]

■ Thomas argues that his rights to present evidence tending to show that another person committed the crime, to present evidence that undermines the credibility of the main witness against him, and to confront the witnesses against him were violated when the court sustained the state's objection and cut off all inquiry regarding Deputy Fancher's difficulty in locating Schwab for two months after the murder took place. During cross-examination, defense counsel established that Deputy Fancher had made an effort to locate Schwab: Fancher admitted that he "had occasion to try and find Schwab." However, when defense counsel asked the deputy about his difficulty in locating Schwab, the court sustained an objection, thus prohibiting further questioning on the subject.[10] We conclude that it was error for the court to preclude this line of inqui-

ry because doing so deprived Thomas of the right to adduce evidence that someone else may have committed the crime, violated his right to elicit evidence that casts doubt on the credibility of the main prosecution witness against him, and infringed on his ability to question Deputy Fancher in violation of the Confrontation Clause.

(1) *Thomas has a right to present evidence tending to show that someone else committed the crime.*

■ Evidence that someone other than the defendant may have committed the crime is critical exculpatory evidence that the defendant is entitled to adduce. *See United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir.1996) ("[F]undamental standards of relevancy ... require the admission of testimony which *tends to prove* that a person other than the defendant committed the crime that is charged" (emphasis added) (citations omitted)). This is particularly true in a case in which the evidence suggests that the prosecution's main witness may be the perpetrator. Here, Thomas attempted to elicit evidence through Deputy Fancher's cross-examination that Schwab was evading the police— evidence that would tend to show Schwab's culpability. *See, e.g., United States v. Harris*, 792 F.2d 866, 869 (9th Cir.1986) ("Evidence of flight is generally admissible as evidence of consciousness of guilt and of guilt itself."). The state argues that the "Schwab did it" argument is mere speculation; however, we recently held that:

> Even if the defense theory is purely speculative ... the evidence would be

---

9. The district court did not certify this issue for appeal; however, we have previously granted Thomas's motion to broaden the scope of his appeal to include this claim.

10. Specifically, Deputy Fancher testified on cross-examination as follows:

 Q. You had occasion then to try and find Schwab later on [after the day of the incident] did you not?

 A. Yes.

 Q. And you had some difficulty locating him, didn't you?

 MR. SWARTZ [prosecutor]: Objection, relevance.

 THE COURT: Sustained.

relevant. In the past, our decisions have been guided by the words of Professor Wigmore: "[I]f the evidence [that someone else committed the crime] is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt."

*United States v. Vallejo*, 237 F.3d 1008, 1023 (9th Cir.2001) (quoting 1A John Henry Wigmore, Evidence in Trials at Common Law § 139 (Tillers rev. ed. 1983 (alterations in original))).

Thomas maintained his position throughout the trial that Schwab was the perpetrator. In support of this theory, the defense noted, among other things, that Luke's body was found in Schwab's car; Schwab was the last person seen with Luke when he was alive; Schwab interfered with Renee Ali's attempts to apply pressure to Luke's chest wound in direct contravention of the instructions he was given by the paramedics; Schwab gave untruthful answers to the 911 operator and to the police; Schwab owed Luke money as evidenced by the note found in Luke's pocket; Schwab obtained possession of the note and later contended that he could not remember what he did with it; and Schwab, like the killer, is right-handed while Thomas is left-handed. Thomas should have been permitted to buttress his theory that Schwab was the actual killer through cross-examination of Deputy Fancher that might have established that Schwab was attempting to avoid the police. The prosecution's case rested almost exclusively on Schwab's allegations. Therefore, the erroneous preclusion of evidence that could have supported Thomas's claim that Schwab was the murderer interfered with Thomas's right to present critical exculpatory evidence that someone else committed the crime. *See DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir.2001) ("[T]he erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense."); *see also Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

(2) *Thomas has a right to elicit evidence that would tend to undermine Schwab's credibility.*

 This court has recognized that "where a defendant's guilt hinges largely on the testimony of a prosecution's witness, the erroneous exclusion of evidence critical to assessing the credibility of that witness violates the Constitution." *DePetris*, 239 F.3d at 1062 (citing *Franklin v. Henry*, 122 F.3d 1270, 1273 (9th Cir.1997)). Here, the prosecution's case rested almost exclusively on Schwab's testimony. Consequently, it was important that Thomas have a full opportunity to present evidence that might impeach Schwab and cast doubt on his credibility. The limitation on Thomas's questioning of Deputy Fancher infringed on this right. Had Thomas been permitted to ask Deputy Fancher about Schwab's attempts to evade the police for two months after the murder, the answer might well have caused the jury to question Schwab's reason for doing so and cast doubt on the truthfulness of his testimony.

(3) *Thomas has a right to confront Fancher by exploring the circumstances surrounding his obtaining the evidence he offered.*

The truncation of Deputy Fancher's cross-examination also implicated Thom-

as's Confrontation Clause rights. *See Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (holding that restrictions on cross-examination can violate the Confrontation Clause). The state's purpose in having Deputy Fancher testify was to buttress Schwab's version of the events by having Fancher repeat the story that Schwab had told him. The jury would thus hear the "facts" of the case from the mouth of a law enforcement officer, not just from Schwab. *See United States v. Gutierrez,* 995 F.2d 169, 172 (9th Cir.1993) (noting that law enforcement officers "often carr[y] an aura of special reliability and trustworthiness"). Because the defendant had no reason to question Fancher's truthfulness, his only means of "confronting" Fancher's testimony was to cast doubt on the truthfulness of the story that Fancher was repeating. The most effective way to do that was to elicit evidence from Fancher that would tend to show Schwab's lack of credibility. Thus, by improperly cutting off the cross-examination regarding Deputy Fancher's difficulty in locating Schwab, the trial court prevented Thomas from casting doubt on Fancher's testimony in the only way available to him. The state argues that any error was harmless, in part because counsel could have cross-examined Schwab directly on this point. Such cross-examination would, however, have been a wholly inadequate substitute for a full and fair cross-examination of Deputy Fancher: Schwab had reason to lie and to deny that he sought to evade the police (particularly if he was the one who killed Luke) whereas Deputy Fancher was an impartial witness who could reasonably be expected to tell the truth.

(4) *The state contends that the truncation of Fancher's cross-examination is harmless error.*

The state contends that any error resulting from the limitation of Fancher's cross-examination is harmless because the claim that Fancher would have testified that Schwab sought to evade the police is purely speculative. We reject this argument. Fancher's testimony was sufficient to raise the evasion issue and to justify further inquiry. The reason that there is no other evidence in the record regarding evasion is that Thomas's cross-examination of Fancher was improperly curtailed before he could elicit the information he sought to obtain. That information was within the exclusive knowledge and possession of the state and its witnesses and was not available to the defense. Under these circumstances, it would not be fitting to penalize Thomas for failing to divine the answers that Fancher would have given. To the contrary, we might well presume that the answers would have been contrary to the state's position. In any event, for the reasons we have already explained, we need not determine whether this, or any other, error standing alone would be harmless.

3. CUMULATIVE ERROR

We hold that the cumulative effect of the three significant trial errors we have discussed was highly prejudicial to Thomas and "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868. The analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is similar to the analysis used in determining, under *Brecht,* whether an error had "a substantial and injurious effect" on the outcome. *See McKinney,* 993 F.2d at 1385 (describing the similarity between the *Donnelly* standard and the *Brecht* standard). Cer-

tainly, where the *Donnelly* standard is met, so too is *Brecht*. In analyzing prejudice in a case in which it is questionable whether any "single trial error examined in isolation is sufficiently prejudicial to warrant reversal," this court has recognized the importance of considering "the cumulative effect of multiple errors" and not simply conducting "a balkanized, issue-by-issue harmless error review." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996); *see also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir.2000) (noting that cumulative error applies on habeas review); *Matlock v. Rose*, 731 F.2d 1236, 1244 (6th Cir.1984) ("Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.").

Here, the erroneous admission of the "triple hearsay" statement offered by a law enforcement officer—that Thomas and Luke engaged in a physical confrontation on the day of the murder during which Thomas was beaten up by Luke and that Thomas then said that he was going home It established a motive for Thomas to kill to "get his knife" was especially prejudicial. Luke and showed that he had access to a murder weapon. This error alone may well have caused the jury to resolve the credibility battle between Thomas and Schwab in Schwab's favor.

Although the "triple hearsay" error standing alone is so prejudicial as to have likely created "a substantial and injurious effect" on the outcome, *Brecht*, 507 U.S. at 623, 113 S.Ct. 1710, here we consider its effects in conjunction with that of two other serious errors. As a result of the prosecutor's misconduct, the jury was informed that Thomas had previously used a weapon, specifically a gun, to commit a criminal offense. This court has described firearms evidence as "unique" because of its "visceral impact" on the jury. *Hitt*, 981 F.2d at 424. The improper gun evidence, coupled with the improper testimony regarding Thomas's knife, connected the defendant to the use and possession of two different kinds of weapons, both of which are known to prejudice and inflame jurors' emotions. *See Hitt*, 981 F.2d at 424 (noting that people "fear and distrust" weapons). The third error, the obstruction of Thomas's right to confront Deputy Fancher and to present evidence to support his claim that Schwab was the true perpetrator, exacerbated the prejudice to the defense by preventing Thomas from adducing potentially important evidence to support his principal defense theory. Collectively, these errors resulted in the jury's erroneous consideration of crucial inculpatory evidence, tended to inflame the jurors and unfairly prejudice them against Thomas, adversely affected Thomas's ability to undermine the credibility of the prosecution's principal witness, and improperly limited his opportunity to offer his own defense. Given that the only substantial evidence implicating Thomas was the uncorroborated testimony of a person who himself had both a motive and an opportunity to commit the crime, the cumulative effect of these errors resulted in a trial that was "so infected ... with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868.

### 4. THE AEDPA STANDARD

 We have held that we must reverse a state court's decision as an unreasonable application of controlling federal law (as determined by the Supreme Court of the United States) when "our indepen-

dent review of the legal question ... leaves us with a 'firm conviction' that one answer, the one rejected by the court, was correct and the other, the application of the federal law that the court adopted, was erroneous—in other words that clear error occurred." *Van Tran v. Lindsey*, 212 F.3d 1143, 1153–54 (9th Cir.2000). Here, our independent review of the state court decisions denying Thomas relief leaves us with a firm conviction that the state courts' failure to find a due process violation was erroneous. To put it in *Van Tran*'s terms, the state court decisions constitute "clear error."

For the reasons explained above, the cumulative effect of the serious errors in this case "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868, and to require the issuance of the writ. A contrary conclusion would constitute an unreasonable application of *Donnelly*'s well-established principles of due process law. Thomas has satisfied the AEDPA standard. Because a *Donnelly* violation always has "a substantial and injurious effect" on the proceedings, a *Donnelly* violation necessarily meets the requirements of *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

## C. CONCLUSION

■ In a case in which the State's evidence consists largely of the uncorroborated testimony of a person who himself had both a motive and the opportunity to commit the crime, there is a greater likelihood that any error will be prejudicial. *See Frederick*, 78 F.3d at 1381. Here, we have not one, not two, but three serious errors that improperly provided the jury with critical inculpatory evidence regarding the defendant; clouded the jury's ability to weigh the evidence fairly; undermined the defense's ability to attack the prosecution's theory of the case; and limited the defendant's opportunity to present evidence in support of his principal defense. The errors in this case involved "the sort of evidence likely to have a strong impact on the minds of the jurors." *McKinney*, 993 F.2d at 1386. Because the errors so infected the trial with unfairness as to constitute a due process violation, and because the state court's failure properly to apply established federal law was clearly erroneous, we reverse the district court's order denying Thomas's petition for a writ of habeas corpus, and remand the matter to the district court with instructions that the writ be issued.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**