Filed 3/19/26  P. v. Deleonperez CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSUE ESAU DELEONPEREZ,<br><br>Defendant and Appellant. | A170540<br><br>(Contra Costa County Super. Ct. No. 04002033637) |

A jury found defendant Josue Esau Deleonperez guilty of 12 counts of lewd acts upon his three step-granddaughters while they were under the age of 14 years.  On appeal, Deleonperez's sole claim of error is that the trial court erroneously excluded evidence that the girls had previously disclosed allegations against another man to their mother "that was relevant to impeach the girls' credibility by contradicting their expected trial testimony" about why they delayed disclosing molestation allegations against Deleonperez.  Deleonperez also contends the exclusion of the evidence violated his federal constitutional rights, and that the error was not harmless.  We find no error and affirm.

1

# BACKGROUND

In March 2022, Deleonperez was charged by information with committing five lewd acts upon Jane 1 (Pen. Code, § 288, subd. (a); counts 1–5), five lewd acts upon Jane 2 (*id.*; counts 6–10), and three lewd acts upon Jane 3 (*id.*; counts 11–13) while they were under the age of 14 years. (We collectively refer to the victims as the girls.) The information further alleged that Deleonperez committed the lewd acts against more than one victim.

Deleonperez was tried before a jury in February and March 2024.[1] The girls testified, as did their uncle's wife, Jayone, Deleonperez, and other witnesses.

The Prosecution's Case

*Family Background*

All of the charged incidents of lewd acts took place while the girls lived with their grandmother and her husband, Deleonperez, in Contra Costa County. Before the charged incidents took place, the girls and their little brother had been living in North Carolina with their mother, Ingrid. At some point Ingrid "just stopped showing up." Ingrid "would leave to go party." Ever since Ingrid met her boyfriend, Ingrid "never came home," and they were "always alone" for days. One girl testified that they "got abandoned . . . and . . . were kind of raising each other." Jane 1 was not able to go to school because she "didn't have no one to leave [her] brother" with, and they "didn't have food or water." Their brother "was one [year old], and he would cry a lot because he didn't have food." "[N]eighbors would give [them] food sometimes."

---

[1] Deleonperez's first trial in 2023 ended in a mistrial when the jury was unable to reach a verdict.

Jane 3 told their grandmother what was going on, and their grandmother and her husband, Deleonperez, came to get them in North Carolina. The girls' grandmother and Deleonperez drove them back to California, where they arrived around August 2020. The girls and their brother ended up living in a house with their grandmother, Deleonperez, their child, and the girls' great grandmother. Their uncle's wife, Jayone, testified: "[A]t the beginning, . . . I knew that the girls had gone through a lot. But eventually, . . . they seemed happy, and then eventually their spirit just seemed like it was dying, and it just seemed very sad all the time."

### Deleonperez's Sexual Abuse of Jane 1

Jane 1 testified that, when she was 12 or 13 years old, on the way to church in Deleonperez's truck, Deleonperez told her to sit closer, and, when she did not, told her again. When she did sit closer, he asked if he could give her a massage. Jane 1 told Deleonperez no, but he put his hand on her leg, brought it closer to her "private part," and "mov[ed] his thumb by . . . the crack of [her] leg and where [her] private part are [sic]."

When Jane 1 was 12 or 13 years old, again in Deleonperez's truck (but this time on the way to the dump), Deleonperez gave his phone to her and asked if he could give her a massage. When she told him no, he told her that he would either give her a massage or take away his phone. Jane 1 gave Deleonperez's phone back to him, and he gave it to her again. At some point, Deleonperez's hand "went down to [Jane 1's] private part," and he touched her skin with his hand and was "moving it around." Jane 1 testified: "He told me that if I told anybody [about what he did], he wouldn't be the one losing; it would be my grandma. [¶] . . . [¶] . . . I thought it meant that if I told somebody and . . . he left or something like that, then my grandma would be suffering because she wasn't working."

3

When Jane 1 was 12 or 13 years old, on a ride to San Francisco in Deleonperez's truck, Deleonperez touched Jane 1's "private part," and "[h]is hand was moving." Deleonperez put his hand on Jane 1's private part while they were inside his truck more than 10 times.

Deleonperez once opened the shower curtain while Jane 1 was in the shower.

*Deleonperez's Sexual Abuse of Jane 2*

Jane 2 testified that she was 11 or 12 years old when she arrived at Deleonperez's home. Once, when Jane 2 jokingly called Deleonperez an "old man," Deleonperez touched Jane 2's chest with his hand and said, "[W]ould an old man do this?" Jane 2 did not tell anybody right after that happened because she "was scared no one was going to believe [her]." Deleonperez touched Jane 2's chest with his hands approximately six or seven times.

Another time, when Jane 2 was seated between Deleonperez and Jane 1 in Deleonperez's truck, Deleonperez gave Jane 1 and Jane 2 a cell phone so they could watch a show. He then put his hand in Jane 2's pants and touched her "private part" under her underwear, and only took his hand out of her pants when Jane 2 "pushed [her] foot into a few water bottles" and Jane 1 "looked up." Asked why she did not tell anybody after that happened, Jane 2 testified: "Because I knew no one would believe me."

Asked why she never said anything to her sisters, Jane 2 testified: "I didn't know if they would believe me." She testified: "[Deleonperez] . . . sat us down in our room. He . . . closed the door, and he was just telling us that if we had ever said anything . . . he wouldn't be the one suffering. That it would be my grandma and his son [be]cause my grandma doesn't work." Asked if that affected why she never said anything about him touching her, Jane 2 testified: "It did. But I knew no one would believe me if I said

4

anything, so that's why I never said anything." Sometimes she had a concern about something happening to her grandmother or her grandmother's child, but she mostly felt that no one would believe her.

*Deleonperez's Sexual Abuse of Jane 3*

Jane 3 testified that she was 10 years old when she got to California. One month after moving into Deleonperez's house, he touched Jane 3's "private part" with his hands while they were in the swimming pool at his house. He did this on more than five occasions. Deleonperez "used to say that it was healthy for him to crack [their] bones," and when he "cracked [Jane 3's] bones," Jane 3 "could feel his private part . . . pushing against [hers]." "[I]t kind of felt like he was adjusting [her] body onto his." Jane 3 could feel Deleonperez's private part against her private part more than five times. Jane 3 also testified that, after Deleonperez started touching her, they were not allowed to have communication with Jayone.

Asked why she had not told anybody, Jane 3 testified: "Because I knew that I wasn't going to get believed, and he would push us away from everyone that we were close to." Part of the reason she never told about the sexual abuse was that "when [they] used to get hit, . . . [Deleonperez] would threaten [them] by saying, I'm not going to be the one losing; your grandma is." Jane 3 did not want her grandmother to "suffer," and she knew that if she told anyone, "[her grandmother] would have to work, and . . . they weren't going to be okay." She did not tell her sisters because she felt like "they would tell [their] grandma, and . . . [she] didn't want them to tell her." She did not tell their grandmother "[b]ecause in the past, she would always pick . . . [Deleonperez's] side," and she knew that her grandmother would not believe her. On redirect, Jane 3 explained: "I didn't tell no one that he was sexually

5

touching me because he would always tell us that he was going to be the one winning, and we would be the one losing because my grandma would suffer."

Jane 3 also testified that Deleonperez opened the curtain when she was showering.

### *The Disclosure of Deleonperez's Sexual Abuse*

On October 16, 2021, an event occurred that resulted in the girls never going back to Deleonperez's house. Jane 3 testified that she went to eat breakfast that morning wearing a hoodie, and Deleonperez told her to take it off. When she asked why, he sent her to her room. Jane 3 cried and, in the afternoon, told Jane 2 that she was "starving." Jane 2 told Deleonperez, who then served Jane 3 a "really big plate of food." Jane 3 ate some of the food and told him that she could not eat any more because she was "already full, and . . . about to throw up," and he told her that she had to "eat it all since [she was] starving." When she told him that she couldn't and was going to throw up, he told her to go to the bathroom and she had to stay there. Deleonperez turned off the bathroom lights and left the bathroom.

Jayone testified that the girls came over to her house, and Jane 3 looked like "her heart was crushed" and "like she had been crying." The girls told her that Deleonperez "punished [Jane 3] by not giving her food," and Jayone was "very upset." Jayone testified: "I knew that prior to them living with my mother-in-law, they were starved. . . . [S]ince they've already experienced so much trauma, how could you do that to them?" Jayone told the girls' mother, Ingrid, to come to her house. Ingrid told Jayone that "it was [Deleonperez's] way of punishing them, and because she couldn't take them, that she couldn't do nothing about it." Jayone told Ingrid that the girls could stay with her, and she "wasn't going to allow [Ingrid] to take them if they were going to go back to that."

6

The girls testified that, after moving to Jayone's house, they started to feel safe.

On November 28, 2021, approximately six weeks after the girls left Deleonperez's house for Jayone's house, Jane 2 disclosed to Jayone that Deleonperez had touched her and what Deleonperez had been doing to her.

The next day, with Jayone present, Jane 2 told Jane 3 that Deleonperez had touched her. Jayone testified Jane 3 "started hysterically crying." Jane 3 cried, screamed, and said "I thought I was the only one getting touched." Jane 3 then told Jayone "what happened to [her]." Jane 3 testified that they left for a doctor's appointment, and she told a social worker at the hospital "what was going on."

Later that night, Jane 2 went into Jane 1's room and asked if Deleonperez did anything to her. Jayone went into Jane 1's room and said: "I need to ask you something. . . . I just want you to tell me if anything happened at grandma's house." Jayone testified that Jane 1 "put her head down, and she started crying." Jane 1 eventually told them something had happened with Deleonperez.

*Expert Testimony*

Dr. Casey Brown, a child abuse pediatrician and the medical director for the abuse and assault program at Contra Costa County Health Services, testified as an expert in the field of child sexual abuse. Dr. Brown testified: "Disclosure is the term we use for a kid telling you something. . . . [I]t's them coming forward with something that's hard to talk about. So we use the term 'disclosure' when the child is talking about some type of scary, negative, bad, abusive situation." Dr. Brown testified: "Many of us . . . have ideas about how a kid should react or talk . . . or behave when they've been sexually abused, and a lot of them are not correct. . . . [K]ids generally don't tell

anyone for a long time.  The average is years. [¶] . . . [M]ostly we think if that really happened, they're going to tell someone right away, right?  Mostly they don't. . . . [D]isclosure is often delayed."

Defense Case

Deleonperez testified in his own defense and denied sexually molesting the girls.  Deleonperez testified that he was alone with Jane 1 in the truck "[o]nce to the dump" and "once to San Francisco."  He used to take the girls to church.  He admitted he would go into the pool with the girls but denied touching Jane 3's private parts in the swimming pool.  He testified there was a rule that the bathroom door had to be unlocked.  He admitted he did walk into the bathroom "once" when Jane 2 was showering.  Deleonperez testified: "[M]y wife had told them to go bathe. . . . [Jane 2] came out doing a record time of almost less than five minutes . . . .  And when I went in, I saw that . . . part . . . of her hair was still dry. [¶] . . . [¶] . . . I told her that she needs to bathe herself right and that I was going to check her again."  Deleonperez testified that he checked her head and that she was still inside the tub, but he did not see her naked.  When he was asked whether he ever told the girls that if they ever said anything about what was going on in his household, that he would not be the one to suffer, but their grandmother would, Deleonperez admitted: "Yes."

Deleonperez testified he was the disciplinarian in the house "the majority of the time."  His method of discipline was to "let them know that by the third time, [he] was going to hit them with the belt."  Asked if he would hit them with a belt if they got bad grades, he admitted: "So the third time, that's when I disciplined them for their grades."  Asked if he ever excessively disciplined the girls, Deleonperez testified: "When I got home . . . I saw that [the girls' brother's] [diaper] was full. . . . I grabbed him . . . ."  "I removed the

8

[diaper] . . . , and that's when I called the girls, and I applied the punishment. [¶] . . . [¶] I grabbed the dirty [diaper], and I stuck it beneath their clothing." In other words, he put their brother's soiled diaper on each of the girls' "behind[s]."

<u>Verdict and Sentence</u>

The jury found Deleonperez guilty of committing four lewd acts upon Jane 1, five lewd acts upon Jane 2, and three lewd acts upon Jane 3 while they were under the age of 14 years and found that Deleonperez committed the lewd acts against more than one victim. The jury did not reach a verdict on count 5, which alleged that Deleonperez committed a lewd act upon Jane 1. At the prosecution's request, the trial court dismissed count 5.

The trial court sentenced Deleonperez to 150 years to life in prison. Deleonperez appealed.

## DISCUSSION

On appeal, Deleonperez's sole claim of error is that the trial court erroneously excluded proffered evidence that purportedly showed that Ingrid had believed the girls' allegations of inappropriate touching against Ingrid's male friend in North Carolina, which would have shown that the girls "had reason to believe they would be believed," which would then "impeach the girls' claim they delayed disclosing the molestation allegations against appellant because they did not think anyone would believe them." This would "thus raise[] doubt about their explanation for not telling anyone," and "therefore support[] an alternative theory . . . , i.e., they had not told anyone because appellant had not actually molested them." Deleonperez further contends the trial court's exclusion of the evidence violated his federal constitutional rights to due process, to confront witnesses, and to present a complete defense, and that the error was not harmless. We conclude that the

9

trial court did not err by excluding the evidence, nor did it violate Deleonperez's federal constitutional rights.

Additional Background

On February 8, 2024, prior to trial, Deleonperez's counsel filed a motion to admit evidence of sexual conduct under Evidence Code[2] section 782, which was denied.[3]

On February 14, Deleonperez's counsel filed a renewed motion to admit evidence of sexual conduct under section 782 raising a new argument that evidence that Ingrid believed the girls' allegations against her male friend in North Carolina and left the male friend was relevant to cast doubt on the girls' testimony at trial that they did not disclose allegations against Deleonperez because nobody would believe them. Discussing the renewed motion, the trial court stated: "So I'm having real difficulty finding any relevance in questioning the girls about prior sexual assaults on them." "But I'll let you address my concerns, but that's . . . an indication of where I'm headed." Deleonperez's counsel replied: "No, your Honor. I will rely on my papers. [¶] I just did a renewed motion because I felt like I didn't do [Deleonperez] justice in outlining for the record why I believe it was relevant. [¶] I understand the Court's ruling. I'll just rely on the papers and submit." The trial court concluded: "I want to be clear that it doesn't seem like we need to be questioning anybody about any prior sexual assaults or acts."

Deleonperez's counsel did not raise the section 782 issue again at trial.

---

[2] All undesignated statutory references are to the Evidence Code.

[3] Defense counsel's initial theory for admitting evidence of the girls' prior allegations has been abandoned on appeal.

10

<u>Relevant Law</u>

Under section 1103, subdivision (c)(5), the rule barring evidence of a victim's sexual conduct with persons other than the defendant does not "make inadmissible any evidence offered to attack the credibility of the complaining witness as provided in Section 782." Section 782 establishes a procedure to determine the admissibility of sexual conduct evidence to attack the credibility of a complaining witness. A defendant must file a written motion with an offer of proof of the "relevance of evidence of the sexual conduct of the complaining witness" and "its relevance in attacking the credibility of the complaining witness." (§ 782, subd. (a)(1).) " '[T]he trial court need not even hold a hearing unless it first determines that the defendant's sworn offer of proof is sufficient.' [Citations.]" (*People v. Mestas* (2013) 217 Cal.App.4th 1509, 1514 (*Mestas*).) If the court finds the offer of proof sufficient, it must order a hearing, outside the presence of the jury, and permit questioning of the complaining witness. (§ 782, subd. (a)(3).) The trial court has broad discretion to weigh the proffered evidence " 'and to resolve the conflicting interests of the complaining witness and the defendant.' [Citation.]" (*Mestas* at p. 1514.)

The decision to admit evidence regarding sexual conduct ultimately depends on the court determining both that the evidence is relevant to section 780, which pertains to credibility of witnesses generally, and that it is "not inadmissible pursuant to Section 352." (§ 782, subd. (a)(4).)

"A trial court's ruling on the admissibility of prior sexual conduct will be overturned on appeal only if appellant can show an abuse of discretion." (*People v. Chandler* (1997) 56 Cal.App.4th 703, 711.) "[D]iscretion is only abused where there is a clear showing the trial court exceeded the bounds of

11

reason, all of the circumstances being considered." (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 32.)

The Trial Court Did Not Err by Excluding the Evidence

We find no error here. The exclusion of evidence of the girls' allegations against Ingrid's male friend in North Carolina was not outside the bounds of reason because the trial court could have reasonably determined that Deleonperez's offer of proof was insufficient to warrant a hearing, let alone admission at trial. (See *Mestas, supra,* 217 Cal.App.4th at p. 1514.)

Deleonperez contends that the trial court erred in excluding the proffered evidence because it showed that Ingrid believed the girls' allegations against her male friend, which showed the girls "had reason to believe they would be believed," which in turn "impeach[ed] the girls' claim they delayed disclosing the molestation allegations against appellant because they did not think anyone would believe them," which "thus raised doubt about their explanation for not telling anyone," which "therefore supported an alternative theory . . . , i.e., they had not told anyone because appellant had not actually molested them." We do not find this highly attenuated rationale persuasive. The trial court could have reasonably concluded that the probative value of the proffered evidence for impeachment was minimal for that very reason. As the Attorney General points out, Deleonperez's argument "theorizes" that, because Ingrid believed the girls' allegations against her male friend, the girls "could not subsequently have credibly feared that nobody would believe a report of [Delonperez's] abuse." Even assuming the girls thought Ingrid believed their allegations against her male friend, the trial court could have reasonably concluded that such evidence would have had limited value as proof that the girls could not have credibly feared that no one would believe their allegations against Deleonperez, their

12

grandmother's husband who had taken them in after Ingrid abandoned them in North Carolina.

To the extent the proffered evidence could conceivably impeach any testimony that the girls "delayed disclosing the molestation allegations against [Deleonperez] because they did not think anyone would believe them," it would have been within the bounds of reason for the trial court to conclude that impeachment of such testimony would not, by extension, impeach the girls' testimony that Deleonperez touched them. The trial court could have reasonably concluded that any quibbles with the words the girls used to articulate at trial why they did not come forward with allegations against Deleonperez until six weeks after they left his house for Jayone's house had limited value as proof that the girls "had not told anyone because appellant had not actually molested them." The trial court could have reasonably concluded that the offer of proof was insufficient because Deleonperez's attempt to use such attenuated evidence to attack the credibility of the girls' allegations against Deleonperez strained credulity.

The exclusion of evidence of the girls' allegations against Ingrid's male friend in North Carolina under section 352 would also have been within the bounds of reason. The trial court could have reasonably concluded that the limited probative value of the proffered evidence was "substantially outweighed by the probability that its admission [would] . . . necessitate undue consumption of time" (see § 352), because a hearing on the girls' allegations against Ingrid's male friend would have been an unduly time-consuming fishing expedition. (See *Mestas*, *supra*, 217 Cal.App.4th at p. 1518 ["The purpose of an Evidence Code section 782 hearing is to establish the truth and probative value of the offer of proof, not to allow a fishing expedition based on sketchy and unconfirmed allegations"].) Furthermore,

13

the trial court could have reasonably concluded that the limited probative value of the proffered evidence was "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice . . . or of misleading the jury" (see § 352), because Deleonperez was attempting to admit evidence of the girls' allegations against Ingrid's male friend through a back door so that the jury would hear that the girls make molestation allegations against men so often that they cannot be believed. (See *People v. Fontana* (2010) 49 Cal.4th 351, 362–363 ["[W]e emphasize that '[g]reat care must be taken to [ensure] that this exception to the general rule barring evidence of a complaining witness'[s] prior sexual conduct . . . does not impermissibly encroach upon the rule itself and become a "back door" for admitting otherwise inadmissible evidence' "].)

Exclusion of the Evidence Did Not Violate Deleonperez's Constitutional Rights

Having found no reversible error under state law, we reject Deleonperez's federal constitutional claims based on the same alleged error. "[T]he general rule [is] that the application of the ordinary rules of evidence under state law do not violate a criminal defendant's federal constitutional right to present a defense, because trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial. [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 503 (*Abilez*).) "This general rule will give way in extraordinary and unusual circumstances . . . ." (*Ibid.*) Extraordinary and unusual circumstances exist when "the excluded evidence was 'so vital to the defense that due process principles required its admission.' " (See *ibid.*)

On the day that Deleonperez filed his renewed motion, the trial court gave Deleonperez's counsel the opportunity to raise his contention that the

14

proffered evidence was relevant and admissible to impeach the girls' testimony that they delayed disclosing the molestation allegations against Deleonperez because they did not think anyone would believe them. The trial court stated: "So I'm having real difficulty finding any relevance in questioning the girls about prior sexual assaults on them." "But I'll let you address my concerns . . . ." But Deleonperez's counsel relied on his papers and submitted without argument on this contention, implicitly suggesting that it had limited probative value for impeachment. Had the evidence of the girls' allegations against Ingrid's male friend been "so vital to the defense," Deleonperez's counsel would have seized the opportunity that day or renewed the motion during the course of the trial. He did not because it was not.

Deleonperez's reliance on *People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, for the proposition that "a defendant's right to present his defense theory is a fundamental right and . . . all of his pertinent evidence should be considered by the trier of fact," (*id.* at p. 599) is misplaced. *Burrell-Hart* is distinguishable because the court concluded that the excluded evidence of "prior allegedly false accusations [was] highly relevant." (*Id.* at p. 600.) Here, Deleonperez's counsel does not contend that the girls' allegations against Ingrid's male friend were false. If anything, the proffered evidence that Ingrid believed the girls' allegations tended to prove that the allegations were true.

Nor are we persuaded by *Thomas v. Hubbard* (9th Cir. 2001) 273 F.3d 1164, overruled on other grounds by *Payton v. Woodford* (9th Cir. 2002) 299 F.3d 815, abrogated on other grounds by *Mancuso v. Olivarez* (9th Cir. 2002) 292 F.3d 939, which Deleonperez cites for the proposition that, " 'where a defendant's guilt hinges largely on the testimony of a prosecution's witness, the erroneous exclusion of evidence critical to assessing the credibility of that

15

witness violates the Constitution.' " (*Thomas* at p. 1178.)  This case is not at all like *Thomas*.  In *Thomas*, "[i]n light of the fact that the prosecution's case was based almost entirely on the eyewitness testimony of a single accusing witness who himself had the opportunity and a possible motive to commit the offense," the Ninth Circuit concluded that the trial court erred by cutting off all inquiry regarding difficulty locating the witness for two months after the murder took place.  (*Id.* at pp. 1168, 1177.)  The excluded evidence was critical because, "[h]ad [the defendant] been permitted to ask . . . about [the witness's] attempts to evade the police for two months after the murder, the answer might well have caused the jury to question [the witness's] reason for doing so and cast doubt on the truthfulness of his testimony."  (See *id.* at p. 1178.)  Here, for the same reason that we concluded that the evidence of the girls' allegations against Ingrid's male friend was not " 'so vital to the defense' " (see *Abilez, supra*, 41 Cal.4th at p. 503), the evidence was not "critical to assessing" the girls' credibility.  (See *Thomas, supra,* 273 F.3d at p. 1178.)  In any event, "[d]ecisions of lower federal courts interpreting federal law are not binding on state courts."  (*People v. Williams* (1997) 16 Cal.4th 153, 190.)

Deleonperez's contention that state evidentiary error "can result in a due process violation by making a criminal trial fundamentally unfair where such error impacts the credibility of the main witness and other evidence of guilt is lacking," and "[t]his is such a case," is unavailing.  The sole case that Deleonperez cites for this argument, *Snowden v. Singletary* (11th Cir. 1998) 135 F.3d 732, is inapposite.  In *Snowden*, the Eleventh Circuit concluded that the defendant was "deserving of relief" because "[a] denial of fundamental fairness occur[ed]" when the trial court "[p]ermitt[ed] an expert to vouch forcefully for the children's credibility," and this "improper evidence '[was]

16

material in the sense of a crucial, critical, highly significant factor.' " (*Id.* at pp. 737-739)  Thus, *Snowden* is distinguishable, not only because it involved permitted prosecution evidence rather than excluded defense evidence, but also because, just as the proffered evidence of the girls' allegations against Ingrid's male friend was not " 'so vital to the defense' " (see *Abilez, supra,* 41 Cal.4th at p. 503), the proffered evidence was not "a 'crucial, critical, highly significant factor.' " (*Snowden* at p. 739.)

### DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Richman, Acting P. J.


_____
Desautels, J.


A170540, *People v. Deleonperez*

17