**Ernesto CHAIDEZ, Petitioner,**

v.

**Mike KNOWLES, Warden, Respondent.**

**No. C 01–2718 VRW(PR).**

United States District Court,
N.D. California.

March 28, 2003.

Ernesto Chaidez, Ione, CA, Pro se.

Mark S. Howell, Attorney General, San Francisco, CA, for Respondent.

## ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS

WALKER, District Judge.

Petitioner, a state prisoner incarcerated at Mule Creek State Prison in Ione, California, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Per order filed on October 11, 2001, the court found that the First Amended Petition stated colorable claims for relief under § 2254, when liberally construed, and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent has filed an answer to the order to show cause and petitioner has filed a traverse.

### STATEMENT OF THE CASE

Petitioner was convicted by a jury in the Superior Court of the State of California in and for the County of Santa Clara of two counts of attempted murder, two counts of rape, one count of forcible oral copulation, one count of dissuading a witness, four counts of corporal punishment on a cohabitant, and one count of forcible penetration with a foreign object. The jury also found true allegations that the attempted murder of one victim was premeditated and that both attempted murders involved the personal infliction of great bodily injury.[1]

On March 4, 1997, the court imposed a life term for the attempted premeditated murder and added a four-year enhancement for inflicting great bodily injury. As to the other counts, the court sentenced petitioner as follows: a seven-year term for the other attempted murder with an additional four-year enhancement for inflicting great bodily injury; four consecutive one-year terms for each count of violence against a cohabitant; a consecutive three-year term for dissuading a witness; and four separate and consecutive six-year terms for the two rapes, penetration with a foreign object, and oral copulation. The court also imposed a restitution fine of $1,000 and victim restitution of $1,664.54.

On April 5, 2000, the California Court of Appeal issued an opinion affirming the judgment of conviction and, on July 12, 2000, the Supreme Court of California denied review. The instant federal habeas petition followed.

### FACTS OF THE CASE

Viewing the evidence in the light most favorable to the verdict, the California Court of Appeal summarized the facts of the case as follows:

Defendant and Yvonne Garcia met in the mid–1980's when they were teenagers. After 1990, they lived together and had two sons Matthew and Brandon. Before 1993, defendant hit Ms. Garcia and received counseling for domestic abuse. In 1993, defendant pleaded no contest to assaulting another person with a deadly weapon.

After May 1995, defendant's behavior became even worse. During this time,

---

**1.** The jury could not reach a verdict on one count of rape, and the court granted the prosecutor's motion to dismiss it.

defendant and Ms. Garcia argued frequently. Defendant beat her with a bat, hit her with his hand, poked her with scissors, burned her with a hot spoon, and shocked her with a stun gun. Once, he made her disrobe and lie next to the stove, closed the doors and windows, turned on the gas, and started to flicker a lighter. She had to beg him to stop. Another time, he made her disrobe and threatened to stick a knife in her vagina if she did not keep quiet. One day defendant found a real estate broker's business card that Ms. Garcia had gotten from a coworker. He became angry and accused her of having an affair.

In June 1995, Ms. Garcia filled out an application for a restraining order against defendant, citing emotional, verbal, and physical abuse and threats. However, she never filed it. Despite his mistreatment, Ms. Garcia remained with defendant because she loved him and thought she could help him.

Ms. Garcia testified that on the night of June 28, 1995, she had a night-time meeting at Home Depot where she worked. Defendant and his father picked her up and then drove defendant's father to his residence, where he lived with his mother, defendant's grandmother, Mary Martinez. On the way, defendant interrogated Ms. Garcia about why she worked so late and accused her of having an affair with the manager. Later, at the house, defendant went into the bathroom with Ms. Garcia and ordered her to remove her pants so he could "check her." He inserted his finger in her vagina, choked, and beat her. When Mary Martinez knocked on the door, they left the bathroom. Meanwhile, defendant's father called Ms. Garcia's father Rudy Garcia and told him to pick her up before defendant killed her. Mr. Garcia immediately called the police.

Officer Lori Perfili of the San Jose Police Department arrived. Ms. Garcia, who was very upset, told Perfili what had just happened and accused defendant of previous domestic violence. Perfili arrested defendant and brought him to the station. There, he said that he and Ms. Garcia argued because he wanted her to stay home and not work. He admitted telling his father that he was going into the bathroom to "check it out," but he did not explain what that meant.

After the incident, Ms. Garcia told her father about it. She was nervous and upset. In a statement dated June 29, she reiterated what had happened and what she had told Perfili about defendant's prior abuse. Nevertheless, a few days later, Ms. Garcia pleaded with her father to post bail for defendant because he was the father of her children. Mr. Garcia agreed because he wanted to help them get ahead. After defendant was released, Ms. Garcia wrote a second statement, saying she had fabricated what happened to her to get even with him because she saw him talking to a woman outside Home Depot and suspected he was having an affair with her.

On direct examination at trial, Ms. Garcia confirmed her original story about what happened on June 28. On cross-examination, however she recanted, saying she had concocted the charges because she was angry after finding a list of women's names and telephone numbers in his pocket. She suspected he was cheating on her and wanted to get him away from her. Later she felt guilty that he was in jail and asked her father to post bail. On redirect, Ms. Garcia reconfirmed her original story, including his accusations, beating, and digital penetration, and said that her written recantation was a lie. She said that defendant had asked her

to write it, and she did so to make him happy.

After defendant's release on bail, he threatened to kill Ms. Garcia several times if she testified against him. He also threatened to kill her family, saying, "Do you want the baby to die?" Ms. Garcia then intended to lie for him and therefore thought the charges would be dismissed.

On July 21, 1995, defendant hid a tape recorder in his and Ms. Garcia's bedroom. On July 23, he retrieved the recorder, and throughout the day repeatedly played the tape for Ms. Garcia because he thought he heard a man's voice. He accused her of sleeping with their 13–year–old neighbor. Ms. Garcia heard nothing on the tape and denied his accusation. Defendant called her a liar, bitch, slut, whore, weasel, and mongrel. He punched her in the face, beat her with a bat and belt, poked her with scissors, and made her disrobe. He also confronted the neighbor boy. Defendant told Ms. Garcia that if he went back to jail, she would die. Frightened, she hid a kitchen knife from him. She did not leave the house, however, because she was naked, the doors were locked, and she did not want to leave her sons.

Ms. Garcia testified that during that day she had sexual intercourse with defendant two or three times and orally copulated him once. Although he beat her before they had sex, she denied that he forced her to have sex. However, she admitted that in a recorded statement she gave police and later at the preliminary hearing, she said defendant had used force or threatened to do so. She described defendant as "psycho" that day, which she attributed to drugs, although she did not see him use any that day.

At about 9:00 p.m. that evening, Ms. Garcia's father came by the house and knocked on the door. He had been at a barbecue and during the course of the day had consumed three or four beers. Defendant and Ms. Garcia were in the kitchen, and he told her not to answer the door. However, their son Matthew let Mr. Garcia in, and he began to play with both children in the living room. Matthew seemed nervous and upset and said that defendant had choked his mother. At this time, defendant told Ms. Garcia to act as if nothing had happened. He went to the living room and asked Mr. Garcia to go to the store. However, Ms. Garcia came out and begged her father not to leave. She was hysterical and said that defendant had stabbed her with scissors, cut her hair, and threatened to kill her. Defendant immediately pushed her into the bathroom and choked her. He tried to shut the door, but her foot was in the way. Mr. Garcia told defendant to leave her alone and pulled the door open. Defendant threatened him, pushed Ms. Garcia back out into the hallway, and then picked up Brandon, who was with Matthew nearby, and asked, "Do you want me to kill the babies too?" Mr. Garcia took Brandon from defendant and then brought both children to a neighbor and asked her to call the police.

Meanwhile, defendant pushed Ms. Garcia into their bedroom and onto the floor. He grabbed a sword that he kept there and stabbed her in the stomach, saying "Bitch, I told you not to say anything." Ms. Garcia screamed for her father. When Mr. Garcia entered the room, defendant was standing over Ms. Garcia, pulling the sword from her stomach, and appeared ready to stab her again. He called Ms. Garcia a bitch and said he would kill everyone. Mr. Garcia rushed to protect his daughter, but defendant hit him on the head with the sword and then struck him in the face,

knocking out teeth and severing part of his tongue. Ms. Garcia tried to pull defendant away, but he pushed her down and stabbed her in the back. Mr. Garcia rushed at defendant again and was stabbed through the arm. He grabbed hold of the sword, and as he and defendant struggled for it, he was wounded in the neck and chest. Defendant was stabbed in the leg.

Ultimately, defendant released the sword, and when Mr. Garcia got control of it, he told his daughter to leave. Defendant fled past Mr. Garcia into the living room. At this point, Ms. Garcia tried to call the police, but defendant had previously disconnected the telephone. She also tried to use defendant's cell phone but could not get it to work. She then ran out of the house to the neighbor for help but no one answered the door. Mr. Garcia followed defendant out of the bedroom, and defendant tried to block him in the hallway with a large plastic children's slide. He begged Mr. Garcia not to kill him. Mr. Garcia tried to strike defendant with the sword, but defendant escaped out the front door.

Defendant joined Ms. Garcia outside and urged her to go with him, saying her father was going to kill him. As they walked together, Ms. Garcia collapsed. Defendant knelt next to her and begged her not to die because he loved her. Mr. Garcia came out of the house and was approaching defendant with the sword. However, by this time Officer Tom Rogers of the Campbell Police Department and other police officers had arrived, and Rogers ordered Mr. Garcia to drop the sword, which he did. Mr. Garcia told Rogers that defendant had stabbed Ms. Garcia and threatened to kill Brandon. Officer Harold Abbott of the Campbell Police Department attended to defendant and Ms. Garcia, and she told him that defendant had tortured her

all day long and that her father had protected her from defendant. Abbott arrested defendant, and Ms. Garcia and her father were taken to the hospital. Officer Eric Pearson of the Campbell Police Department took custody of the children, and Matthew told him that "daddy choked mommy." Pearson later spoke to Ms. Garcia, who said defendant had hit her with a bat and stabbed her.

Police searched defendant's house, took photographs of the scene, and made a videotape of it. Among other things, they found a knife underneath a microwave oven in the kitchen, a stun gun, a baseball bat, two tape recorders, and electric shears. A test of defendant's blood revealed the presence of methamphetamine.

Ms. Garcia testified that after defendant's arrest, they spoke numerous times over the phone. He also sent her letters and cards from jail. She denied that he attempted to influence her testimony. However, she identified a group of letters she received just before she was supposed to testify that the police had found stuffed in a pillowcase in her bedroom. At first she said that she did not recognize who wrote them. Later she testified that defendant had written all or parts of each one. She equivocated about whether she glanced at, read some, or read all of them.

One of the letters (Exhibit 16) reads, "Yvonne[,] you need to study these very well (Questions)[.] There [sic] gonna be used by my lawyer in trial. The answers are all there baby .... Mijos need me out there jus [sic] remember that, I love you dearly momma." Thereafter, the letter contained questions and answers. For example, "Q# So your [sic] saying he never force[d] you? Answer = Yes, I wanted it to happen." In all, the document coached Ms. Garcia to say that she was upset with defendant,

wanted to get even with him by fabricating the charges. However, she did not realize how serious the charges and wanted to tell the truth because he did not deserve to go to prison. Although she explained to the prosecutor that her allegations were false, he told her he would file perjury charges if she did not stick to her original story. "Q# Are you lieing [sic] for him now? Answer No."

In another letter (Exhibit 15), defendant says, in pertinent part, "I'm hoping that you'll be able too [sic] help me out on this situation. To be honnest [sic] with you I'm geting [sic] desperit [sic] about all these charges. As you can see I wrote questions for you to steady [sic]. I know your [sic] afraid about geting [sic] in trouble but I wrote it down so that cant [sic] happen to you. Especially the part about the D.A. your lawyer. Theres [sic] no way he can do that because when you explain that to the jury he wont [sic] be able too [sic] charge you. You wanted to tell the truth but he more or less said if you do now he well [sic]. He's forceing [sic] you to lie on the stand. I have the same paper and I'll give it to my lawyer to ask you! Keep steadying [sic] it and try to remember you don't [sic] have too [sic] remember word bye [sic] word but try and keep it mostly the way I wrote it."

In another letter (Exhibit 17), defendant explained that the prosecutor is charging him with dissuading a witness based on a claim that he coerced her into writing the recantation letter. After copying her written recantation verbatim, defendant wrote, "You need to more or less memorize your story so that [the prosecutor] cant [sic] perjure you. Like I said before he [sic] gonna try and say I made you write this and that I coerced you. The ball is in your court babe its [sic] up to you to make the next play."

Officer Kristan Gabrielson, a Santa Clara County Correctional Officer, testified that on July 26, 1995, she overheard a conversation between defendant and another inmate Binh Nguyen. Nguyen asked what defendant "was in for." Defendant answered he was there for stabbing his girlfriend. He then pointed to the right side of his torso and then to his back.

Richard Ferry, a licensed counselor, testified as an expert on battered women's syndrome. He explained that the syndrome is a collection of symptoms typically observed when there has been an abuse in an intimate relationship, including depression, free-floating anxiety, and exaggerated startle responses. He said victims often develop distorted thinking to explain the violence used against them. For example, victims think violence is normal and justified. They think they are responsible for and can control the abuse. And rather than blame perpetrators, they will blame drug use or other women.

Ferry noted that victims often learn to be helpless, stop resisting abuse, and decline to escape from it. He also described three phases of what he called the "cycle theory of violence." First is the tension building phase, where the perpetrator becomes argumentative, clipped, and hostile. In response, the victim tries to appease and mollify or minimize and avoid interaction. This usually aggravates the situation because the perpetrator feels abandoned and starts getting violent. As tension builds, the victim often precipitates the next phase of acute violence simply to "get it over with." Thereafter, the perpetrator experiences grief and remorse, promises to change, and tries to woo the victim back. The victim, in turn, succumbs and even assumes some responsibility for the violence.

Ferry also explained the concept of "traumatic bonding" between a powerful and a weak member of a couple. For example, children in abusive homes will often prefer them to foster homes; or hostages will sometimes remain with their captors despite the opportunity to leave. With respect to battered women, they may adopt the abuser's attitudes and perspective and feel truly in love with him. They may also try to protect him from the consequences of his conduct by recanting previous allegations of abuse.

Ferry opined that a recantation under circumstances of abuse like those described by Ms. Garcia was consistent with battered woman's syndrome.

### The Defense

Defendant testified that he started using methamphetamine in March 1995. It gave him energy but made him grouchy and paranoid. He admitted having girlfriends, which made Ms. Garcia jealous, and as a result they often argued. Defendant said his relationship with Ms. Garcia deteriorated in May 1995 after he confronted Ms. Garcia about some stolen jewelry.

Defendant testified that on June 28, he was "curious" about Ms. Garcia's late-night meeting at Home Depot. His main complaint to her was that he wanted her to stay at home and take care of the children and not work. She got angry and brought up his affairs. At his father's house, they both had to use the bathroom, and inside he again asked about her meeting. When Ms. Garcia got angry and loud, he pushed her. However, he denied hitting or choking her, making her pull her pants down, or digitally penetrating her. He admitted telling Officer Perfili that he went into the bathroom with Ms. Garcia to "check it out," but explained he only wanted to find out what had happened that evening

Defendant denied that after his release on bail he hit, beat, or shocked Ms. Garcia. He said he used methamphetamine on July 21 and planted the tape recorder to find out if Ms. Garcia was harassing his girlfriends. Later, when they listened to the tape, he questioned her about a noise he heard on it, and she spontaneously denied having an affair. This made him suspicious, and they argued most of the night.

On July 23, defendant was feeling tired and paranoid. They had consensual intercourse twice and orally copulated each other. He never hit her, used force, or threatened her. He said he asked Ms. Garcia about a missing drill, and later questioned the neighbor boy about whether he had ever been in the backyard or house but did not accuse him of having an affair with Ms. Garcia. Later, Ms. Garcia got angry because he did not take her to a church festival.

When Mr. Garcia arrived early that evening, defendant and Ms. Garcia were acting cool toward each other. Defendant testified that he asked Mr. Garcia to go to the store for him, and suddenly Ms. Garcia falsely accused him of torturing her, which, he testified, was not true. Mr. Garcia, who smelled like alcohol and seemed drunk, confronted defendant. He had once threatened to kill defendant if he ever hit his daughter. Ms. Garcia took the children into another room. Mr. Garcia then punched defendant in the face, and defendant pushed him back and ordered him to leave. When Mr. Garcia came back at defendant, defendant retreated to the bedroom. He denied that he pushed Ms. Garcia into the bathroom. Mr. Garcia pursued defendant into the bedroom, grabbed him, and slammed him against the wall. As they started to wrestle, Ms. Garcia screamed and became hysterical. Defendant told her to be quiet.

She tried to push him, and he grabbed her by the throat. She in turn, grabbed his testicles and squeezed them. Mr. Garcia then picked up one of the boys, and as defendant tried to take him back, both Ms. Garcia and Mr. Garcia attacked him. He let go, and Mr. Garcia took both boys out of the house. Defendant asked Ms. Garcia why she had caused all of this commotion. At that point, Mr. Garcia returned to the bedroom, grabbed defendant's sword, and stabbed him in the leg. Defendant "snapped" and grabbed Mr. Garcia by the throat. Ms. Garcia started screaming at defendant calling him names and joined in a free-for-all fight, at one point getting between him and Mr. Garcia.

Defendant testified that he never got control of the sword and did not see how Mr. Garcia or Ms. Garcia received their wounds. He denied that he stabbed either of them and surmised that it must have happened when they were all struggling with each other. As the fight continued, he pushed Ms. Garcia, and she ran out the door. He was feeling dizzy, fled to the living room, and tried to block Mr. Garcia with a children's toy. Mr. Garcia followed, swinging the sword. Defendant yelled "No, don't Rudy. Don't." Defendant then went outside and met Ms. Garcia and told her that Mr. Garcia was going to kill him. She was helping him because of the injury to his leg, but she could not breathe and collapsed. Shortly thereafter the police arrived.

Defendant testified that Ms. Garcia wrote her own recantation, and he denied prompting her to do so. Defendant also denied writing two of the letters attributed to him (Exhibits 15 and 16) but admitted writing one (Exhibit 17). He did so because he did not want her to commit perjury. He wrote down what she had said to the defense investigator so that she would know the truth.

Defendant professed his love for Ms. Garcia. He said he never planned or intended to kill her or her father. He denied that he ever threatened anyone. He claimed that Ms. Garcia fabricated all allegations of abuse and specifically denied that he shocked her with a stun gun, hit her with a bat or belt, put a knife in her vagina, or threatened to blow up the gas stove. He also denied burning Ms. Garcia with a hot spoon, explaining that he had accidentally bumped into a hot frying pan. He said he was not jealous when he found the real estate agent's card; rather, he asked her about it because he was interested in getting his real estate license.

Mary Martinez, defendant's grandmother, testified that sometime after July 23, Ms. Garcia called her and said that her father had threatened to kill defendant, and when she stepped between them to protect defendant, her father inadvertently stabbed her.

Miriam Martinez, defendant's aunt, testified that after July 23, Ms. Garcia called her and said that defendant had stabbed her and had tried to chop off her father's head. However, Ms. Garcia called again later and said she had lied and that she had thrown herself between defendant and her father because her father was trying to kill defendant. Ms. Garcia told her she had tried to tell this to the prosecutor, but he refused to believed her. Ms. Garcia explained to Martinez that she had originally accused defendant because she did not want her father to go to prison and felt that defendant would "get off."

*People v. Chaidez*, No. H016600, slip op. at 2–12 (Cal.Ct.App. Apr. 5, 2000) (alteration in original) (footnotes omitted) (Resp't Ex. OO).

## DISCUSSION

### A. *Standard of Review*

A federal writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. 1495. Rather, that application must be "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495.

The only definitive source of clearly established federal law under 28 U.S.C.

§ 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412, 120 S.Ct. 1495; *Clark v. Murphy,* 317 F.3d 1038, 1044 (9th Cir.2003). While circuit law may be persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id.*

### B. *Claims*

Petitioner raises three claims for relief under 28 U.S.C. § 2254:(1) the trial court improperly denied petitioner's retained counsel's motion to withdraw and petitioner's motion to dismiss retained counsel; (2) the trial court's abuse of discretion errors conceded by the state appellate court resulted in cumulative prejudice; and (3) the trial court improperly failed to instruct the jury on the lesser-included offense of attempted voluntary manslaughter.

#### 1. *Refusal to dismiss petitioner's retained counsel*

Petitioner claims that the trial court violated his Sixth Amendment right to counsel when it refused to dismiss petitioner's retained counsel, Stuart Kirchick, upon motions by Mr. Kirchick to withdraw, upon a motion by petitioner to dismiss Mr. Kirchick, and in the face of an insurmountable conflict of interest. Petitioner also claims that the trial court failed to make an adequate inquiry into the alleged conflict.

##### a. *Background* [2]

Petitioner was represented by Deputy Public Defender Peggy Banks until February 1996, when retained counsel was sub-

---

**2.** The following background summary is taken primarily from the California Court of Appeal's opinion in this matter. See *People v.*

*Chaidez,* No. H016600, slip op. at 13–14, 15–17 (Cal.Ct.App. Apr. 5, 2000).

stituted. At Mr. Kirchick's request, the trial date was then continued several times. After a pretrial conference in April 1996, an impasse was declared, and the case returned to stand-by on the Master Trial Calendar. In late July 1996, an impasse again was declared.

On August 26, 1996, Mr. Kirchick attempted to declare a conflict of interest, but petitioner was not present in court, and the matter was continued until August 28, 1996.

On August 27, 1996, Mr. Kirchick filed a motion to withdraw. In his supporting declaration, Mr. Kirchick stated that the case had been on trial stand-by for a month. He had received discovery, prepared a defense, and drafted motions in limine. Until then, he had no "extraordinary problems" representing petitioner. Mr. Kirchick further reported that on August 21, 1996, he visited petitioner in jail for 15 minutes and told him he would return the morning of August 23 and meet until noon. On that day, counsel arrived at 10:00 a.m., but there was no interview room available for the rest of the morning. Mr. Kirchick briefly met with petitioner, gave him some transcripts, and explained that they could not meet at that time. According to Mr. Kirchick, petitioner became agitated and did not believe his explanation. At the same time, a guard directed Mr. Kirchick to leave the area. As Mr. Kirchick started to leave, petitioner repeatedly asked what was happening. Mr. Kirchick explained that there was no available interview room and that he had been told to leave the area. Then, as Mr. Kirchick entered the elevator, petitioner "directed his arm straight towards me with his finger pointed at me and his thumb up as if he was holding a gun[.]" Mr. Kirchick interpreted the gesture as "a direct threat for my well being which I must take very seriously[.]" Mr. Kirchick dwelled on the incident for the next two days, becom-

ing "more insecure and frightened" and then immediately filed his motion to withdraw.

Mr. Kirchick declared, "Given the current allegations against him, his past conduct with me and of course the latest threat, I do not believe I can zealously and adequately defend my client pursuant to the professional rules of ethics and my personal obligations to my client[.]" Consequently, Mr. Kirchick asked the court to permit him to withdraw as counsel due to a breakdown in the attorney-client relationship.

On August 28, 1996, the court summarily denied the motion:

(Whereupon, pursuant to the luncheon recess court reconvened and the following proceedings were had:)

THE COURT: 9, Ernesto Chaidez. Also 10.

MR. KIRCHICK: He's present in custody. Stuart Kirchick.

THE COURT: The request to withdraw is denied.

MR. KIRCHICK: Thank you, Your Honor.

THE COURT: This matter is on stand-by, and I will send it out for trial.

MR. KIRCHICK: Thank you.

Aug. 28, 1996 Rep. Tr. at 3 (Resp't Ex. F).

On September 12, 1996, the first day of trial, Mr. Kirchick filed a 10–part motion in limine, and the prosecutor filed his witness list and trial brief. Outside the presence of the jury and the prosecutor, petitioner said he had some "pending investigation" and sought a continuance "so that I can find out what they want me to do in regard to whether I should take— what action to take on this issue." When the court asked what the "issue" was, defendant said "a conflict between me and my lawyer." Petitioner explained that nine days earlier on September 3, 1996,

Mr. Kirchick relayed the prosecutor's plea offer—plead guilty and receive a term between 16 and 27 years. According to petitioner, Mr. Kirchick said this was the best he could do; if petitioner did not accept it he "was never going to see daylight again"; and if petitioner accepted the offer, "I will give you $1,000 when you get to San Quentin." Petitioner said that Mr. Kirchick's offer made him mad and "right now I have the bar association, they're sending me some paperwork, and they want to know what's really going on in this, so that's why I'm asking for a little more time."

The court was skeptical and asked Mr. Kirchick to respond. Mr. Kirchick explained that he had merely offered to refund $1,000, the remainder of the retainer, which he had earmarked for trial services. Mr. Kirchick further explained that petitioner had given his car as a retainer, the car had ben sold to a friend of Mr. Kirchick's, the car loan paid off, and net proceeds of the sale represented the actual amount of the retainer.

In response, petitioner stated, "My car was worth blue book when I turned it over. It was the car as is, everything. Take the car to represent me. And I mean, I went on this deal on the pure faith. You now [sic] what I mean? And the car was worth 19 grand. He told me it was worth something else. [¶] There's still a lot of money that's—actually, he got a really decent deal. You know what I mean? Not even for trial. Pretrial he got paid 19 grand. I mean, we're not there yet; but still, we're almost there. I just want to have a little bit of time to have the bar association look into this."

Given Mr. Kirchick's offer to refund what was left of the retainer, the court asked petitioner what there was to look into. Defendant responded, "Extortion." The court dismissed this charge and asked what else petitioner had to complain about.

Petitioner then said, "I feel I lost confidence in him. I feel like he's selling me out. I lost faith." At that point, the court reminded petitioner that he faced a life sentence if he went to trial and that he had rejected a 16–to–27–year plea offer. It then said, "You can have your trial. We have 90 people ordered for tomorrow. We're ready to go. That's fair enough." Treating petitioner's proffer as a motion for substitution of counsel under *People v. Marsden*, 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (1970), the court denied it.

At that point, Mr. Kirchick said he was unaware of any possible State Bar investigation against him but felt that the fee dispute created a direct conflict of interest: "I just don't know if I could realistically defend him and realistically whether he can aid in his defense to me if we're in the midst now of a state bar investigation. As soon as he gets the complaint and signs it, I mean, doesn't that put us in an actual conflict?" The court opined, "I guess people can do all kinds of things to drag cases out; right? We'd never go to trial." Mr. Kirchick agreed. The court reiterated that the parties were ready for trial, the jury was ordered, and it had read the motions in limine and was prepared to rule on them. Mr. Kirchick said he too was ready to go. Petitioner then asked, "[H]ow can we go on? Like he said, if he doesn't feel comfortable with me and I don't feel comfortable with him, it would be ineffective assistance of counsel. He is incompetent." Petitioner then referred to Mr. Kirchick's previous request to withdraw. The court said it had read the file and that the motion had been denied. It then reiterated that it was denying petitioner's motion.

After the in limine motions were heard, the following exchange took place:

THE COURT: Do you want to withdraw the motion you made now or not?

THE DEFENDANT: I'll talk to him.

THE COURT: That's fine.

THE DEFENDANT: Withdraw the motion, you said?

THE COURT: Marsden. That's what you did, but I saw you shaking hands so I don't know what you're doing.

THE DEFENDANT: We'll talk.

Sept. 12, 1996 Rep. tr. at 32 (Resp't Ex. H).

Thereafter, petitioner proceeded through the guilt portion of the trial with Mr. Kirchick as his attorney.[3]

### b. *Controlling federal law*

■ "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer he prefers." *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (citation omitted). Put simply, the Sixth Amendment guarantees effective assistance of counsel, not a "meaningful relationship" between an accused and his counsel. *Morris v. Slappy*, 461 U.S. 1, 14, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).

■ To establish a violation of the right to effective assistance of counsel, a defendant ordinarily must establish "a reasonable probability that, but for coun-

sel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice to obtain relief." *Cuyler v. Sullivan*, 446 U.S. 335, 349–50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

■ In order to establish a violation of the Sixth Amendment based on a conflict of interest, a defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348, 100 S.Ct. 1708 (footnote omitted). He must show that counsel "actively represented conflicting interests" and that this "adversely affected [counsel's] performance." *Bragg v. Galaza*, 242 F.3d 1082, 1086 (9th Cir.), amended, 253 F.3d 1150 (9th Cir.2001).[4]

■ In reviewing the state courts' rejection of petitioner's Sixth Amendment claim(s), this court's inquiry is not whether the state trial court abused its discretion in denying the motions to withdraw/dismiss retained counsel. *Schell v. Witek*, 218 F.3d 1017, 1024–25 (9th Cir.2000) (en banc) (overruling earlier circuit precedent that habeas court's inquiry was whether the state court's denial of motion to substitute counsel was an abuse of discretion). Rath-

---

**3.** When the case was called for sentencing on December 17, 1996, nearly three months after the jury rendered its verdict on September 30, 1996, petitioner requested to proceed pro per and Mr. Kirchick stated that petitioner had now filed a state bar complaint against him. The court gave petitioner the choice of proceeding to sentencing either on his own or with Mr. Kirchick. Petitioner chose to go forward on his own.

On February 4, 1997, Deputy Public Defender Peggy Banks, petitioner's first defense counsel, was reappointed to represent peti-

tioner. She represented him at sentencing on March 4, 1997.

**4.** In order to establish a Sixth Amendment violation where the trial court failed to inquire (or failed to inquire properly) into a potential conflict of interest about which it knew or reasonably should have known, a prisoner still must demonstrate that a conflict of interest adversely affected his counsel's performance. *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 1238, 152 L.Ed.2d 291 (2002).

er, the "ultimate constitutional question" on federal habeas review is whether the state trial court's denial of the motions "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." Id at 1026.[5]

■ Finally, in reviewing the state courts' rejection of petitioner's Sixth Amendment claim(s), this court may also consider the impact that last-minute motions seeking to discharge counsel have on the orderly process of justice. See *Morris*, 461 U.S. at 11–12, 14–15, 103 S.Ct. 1610 (noting that broad discretion must be granted trial courts on matters of continuances, including where invocation of 6th Amendment right to counsel may disrupt trial proceedings); see also *United States v. Castro*, 972 F.2d 1107, 1109 (9th Cir. 1992) (motion to substitute counsel 3 days before trial deemed untimely).

### c. *Analysis*

Petitioner specifically claims that the trial court erred by refusing to discharge Mr. Kirchick on two occasions: (1) on August 28, 1996, when Mr. Kirchick moved to withdraw 15 to 17 days before trial, due to the incident at the jail; and (2) on September 12, 1996, the very day trial was set to begin, when petitioner moved to discharge Mr. Kirchick, and then Mr. Kirchick sought to withdraw, due to an alleged conflict of interest.

### 1. *August 28, 1996 ruling*

■ The California Court of Appeal considered and rejected petitioner's claim that the trial court erred in denying Mr. Kirchick's motion to withdraw:

As the record reveals, when defendant made his provocative hand gesture, he was expecting to confer with counsel for a few hours, and trial was imminent. Before that day, counsel and defendant had worked together for seven months without major interpersonal difficulty or apparent disagreement over matters of substance or counsel's performance. Shortly after the incident, counsel file his motion, apparently without discussing his reaction and feelings with defendant. Under these circumstances, the court could reasonably find that defendant's gesture was an isolated, impulsive act of anger and frustration, and that the gesture and counsel's immediate reaction did not necessarily represent a total breakdown in the attorney-client relationship or otherwise jeopardize defendant's right to effective assistance. When we view such a finding in light of the fact that (1) trial had already been substantially delayed due to the previous substitution of counsel and subsequent continuances, (2) the parties were ready for trial, (3) the court was prepared to rule on defense motions *in limine*, and (4) withdrawal would have necessitated further substantial delay, we cannot conclude as a matter of law that the trial court manifestly abused its discretion. On the contrary, it was, in our view, prudent and appropriate for the court to refocus counsel on his professional obligations and give him time to see if his

---

5. If a serious conflict did exist that resulted in the constructive denial of assistance of counsel, no further showing of prejudice is required. However, if the serious conflict did not rise to the level of a constructive denial of

counsel, petitioner must prove he was prejudiced by the conflict. *Schell*, 218 F.3d at 1028–29 (citing *Strickland*, 466 U.S. at 691–92, 104 S.Ct. 2052).

feelings abated or whether they did in fact interfere with his ability to work with defendant and provide effective representation.

*People v. Chaidez*, No. H016600, slip op. at 14–15 (Cal.Ct.App. Apr. 5, 2000).

The California Court of Appeal did not err in rejecting petitioner's claim. Although Mr. Kirchick represented to the trial court in his declaration that the attorney-client relationship had broken down due to what he perceived as a threat from petitioner, Mr. Kirchick also acknowledged that until petitioner pointed his finger at him, they had been "progressing towards trial without any extraordinary problems." At the August 28, 1996 hearing, Mr. Kirchick did not elaborate on why he thought that his client's hand gesture constituted an actual threat and, importantly, petitioner did not personally join in his attorney's request to withdraw or offer any explanation that would support Mr. Kirchick's assertion of an actual conflict. Mr. Kirchick's declaration suggested that he and petitioner had had a disagreement; however, nothing in the record indicates that any disagreement between Mr. Kirchick and petitioner had so seriously damaged their relationship that petitioner's right to the effective assistance of counsel would be substantially impaired if Mr. Kirchick's motion to withdraw was not granted. It simply cannot be said that at that point in the proceedings any conflict between Mr. Kirchick and petitioner "had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell*, 218 F.3d at 1025.

Petitioner is not entitled to federal habeas relief on this claim because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable application of, controlling federal law, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

### 2. *September 12, 1996 ruling*

█ The California Court of Appeal considered and rejected petitioner's claim that the trial court erred in denying his motion to dismiss Mr. Kirchick:

Again, we find no abuse of discretion. Defendant made his request on the first day of trial. Granting the motion would have necessitated a continuance for defendant to obtain new counsel and for new counsel to get prepared for trial. Thus, the trial court could reasonably find that discharge would cause a "significant disruption." Moreover, the trial had already been continued for seven months after retained counsel substituted for the public defender, and the parties were finally ready for trial. Defense counsel had filed motions *in limine*, the court had read and was prepared to rule on them, a venire had been summoned, and jury selection was to begin the next day. Under these circumstances, the court could reasonably deem the disruption caused by discharging counsel to be unreasonable

. . . .

In arguing that a continuance would not have been an unreasonable disruption, defendant asserts, among other things, that witnesses would not have disappeared or refused to testify. However, the People point out, even without a continuance, Ms. Garcia, the primary victim-witness against defendant, was a reluctant witness, and on the day she was scheduled to testify, she left the court house, and the court had to issue a body attachment to secure her presence.

Citing *U.S. v. Moore* (9th Cir.1998) 159 F.3d 1154 and *Douglas v. United States* (D.C.App., 1985) 488 A.2d 121,

defendant claims that a potential State Bar investigation of counsel created an actual and direct conflict of interest, which compelled the court to permit discharge and grant a continuance. No so.

In *Moore*, Moore claimed, among other things, that there was an actual conflict based on Moore's *threat* to sue counsel for malpractice in mishandling a plea offer. During a hearing on Moore's request to substitute counsel, defense counsel echoed Moore's concern about a conflict. Nevertheless, the trial court found no actual conflict because Moore's mere threat to sue was not inconsistent with defense counsel's goal of rendering effective assistance. On appeal, the court agreed. Despite Moore's assurances that he had a valid claim for malpractice, the court concluded that "finding an actual conflict from a mere threat would allow defendants to manufacture a conflict in any case. We decline to adopt such an unbounded rule." (*U.S. v. Moore, supra*, 159 F.3d at p. 1158.)

Here, after their September 3 meeting about the plea offer, defendant did not tell counsel he intended to file a complaint. And as of September 12, he had not done so, and there was no pending investigation. Rather, the State Bar was sending him some paperwork so he could decide what to do. Even if defendant was threatening to complain to the Bar, the threat did not, as *Moore* explains, create an actual conflict of interest.

We acknowledge that the court in *Moore* did find ... an irreconcilable conflict based on a complete breakdown in the attorney-client relationship. However, there, Moore had persistently and consistently complained about defense counsel's performance well before trial and had presented strong, cumulative evidence of " 'an atmosphere of mistrust, misgivings and irreconcilable differences' resulting from claims of conflict-

ing interests, ineffective assistance, and a breakdown of the attorney-client relationship." (*U.S. v. Moore, supra*, 159 F.3d at p. 1159.) In particular, Moore was angry that counsel had failed to meet with him in a timely manner to tell him that the [government] had rejected his counter plea offer, failed to meet with him before the [government's] offer expired, and then failed to inform him that another person had accepted the [government's] plea offer. Moore was also angry because counsel had failed to investigate and adequately prepare for trial and had not told him about a problem with doctor bills. In addition, during a meeting, Moore threatened to sue counsel for malpractice, saying, " 'I know how to fix you, you son of a bitch. I'll sue you for malpractice because I happen to know a little something, buddy. If I sue you for malpractice, they will raise your insurance so high you'll go back to washing cars.' " (*Ibid.*) And last, defense counsel said that he felt physically threatened by Moore. (Cf. also, e.g., *Brown v. Craven* (9th Cir. 1970) 424 F.2d 1166, 1170 [defendant so dissatisfied with counsel he would not cooperate or communicate with him]; *United States v. Williams* (9th Cir.1979) 594 F.2d 1258, 1260 [stormy relationship with quarrels, bad language, threats, and counter-threats].)

Defendant's complaint about counsel arising from their discussion of the prosecutor's plea does not reflect a comparable breakdown in the attorney-client relationship. Indeed, as noted, defense counsel had worked on the case for over seven months without substantial disagreement with defendant over trial strategy or the nature of the defense. Moreover, defendant's reasons for seeking-discharge did not involve those matters or counsel's performance. Furthermore, defendant's claim of "extortion"

was far fetched. Finally, the trial court's comments implicitly, and we believe reasonably, suggested that defendant may have been trying to delay the trial. The suggestion gains credence in light of the severity of the charges and possible sentence facing defendant.

Last, defendant's reference to defense counsel's previous motion to withdraw added nothing to defendant's motion. That motion had already been properly denied, and defendant said nothing to substantiate counsel's fear or apprehension. Moreover, the record reflects that after ruling on defense counsel's motion *in limine*, the court asked defendant if he wanted to withdraw his motion to discharge. Defendant said he would talk to counsel. The court then said, "I saw you shaking hands so I don't know what you're doing." Defendant again said, "We'll talk." This exchange confirmed the trial court's implicit finding that the relationship between defendant and counsel had not deteriorated to the point of an irreconcilable conflict.

*People v. Chaidez*, No. H016600, slip op. at 18–21.

The California Court of Appeal also rejected petitioner's reliance on *Douglas v. United States*, 488 A.2d 121 (D.C.1985). Unlike *Douglas*, there was no State Bar investigation pending at the time petitioner sought to discharge counsel. And, unlike *Douglas*, the nature of petitioner's complaint had little potential to affect counsel's performance negatively. *Id.* at 21.

First, defendant agreed that the car, whatever its value, would be counsel's retainer. Second, defendant rejected the plea offer, rendering the amount of any "refund" moot; and third, even if counsel had mistakenly undervalued the car/retainer, we fail to see how this

would have made him less likely to represent defendant vigorously.

*Id.* at 21–22 (footnote omitted).

In sum, the California Court of Appeal concluded that "the record does not establish that it was error to deny the motion to discharge." *Id.* at 22.

The California Court of Appeal did not err in rejecting petitioner's claim. The state appellate court properly concluded that petitioner's motion to dismiss Mr. Kirchick on the eve of trial was untimely, and that neither petitioner nor Mr. Kirchick demonstrated an actual conflict of interest. The court also properly concluded that neither petitioner nor Mr. Kirchick demonstrated a breakdown in the attorney-client relationship implicating petitioner's Sixth Amendment right to effective assistance of counsel.

Petitioner inexplicably waited until the first day of trial to seek to dismiss Mr. Kirchick. No prospective new counsel was identified. Continuing the case under these circumstances at this late stage in the proceedings necessarily would have delayed jury selection, and inconvenienced prospective jurors already on order and prospective witnesses who were set to testify. It also may have influenced the victim, Ms. Garcia, who was subject to tremendous pressure, to absent herself. Cf. *Morris v. Slappy*, 461 U.S. 1, 14–15, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (directing lower courts to take into account the interest of the victim). The certain disruption of the pending trial (which had been continued at least once before to accommodate petitioner's substitution of appointed counsel with retained counsel) weighed against a continuance.

Petitioner's proffered conflict with Mr. Kirchick did not compel a last-minute continuance either. Nothing in the way the fee agreement was structured gave rise to an actual conflict of interest between peti-

tioner and Mr. Kirchick. The agreed-upon retainer was, from the outset, the proceeds from the sale of petitioner's car. That Mr. Kirchick offered to refund petitioner $1,000 from the proceeds if petitioner accepted the plea agreement he had negotiated with the government does not demonstrate an actual conflict of interest between counsel and client. Mr. Kirchick explained that the $1,000 simply represented his estimate of the costs associated with trial and, in any event, petitioner rejected the offer and proceeded to trial. Cf. *United States v. Moore,* 159 F.3d 1154, 1158 (9th Cir.1998) (actual conflict of interest under *Cuyler* involves existence of competing interests affecting counsel's capacity to give undivided loyalty to his client's interests).

The fact that petitioner was contemplating the initiation of a state bar inquiry into the fee agreement, or some other aspect of Mr. Kirchick's representation, did not create an actual conflict of interest. "[F]inding an actual conflict from a [such a] threat would allow defendants to manufacture a conflict in any case." *Id.* The California Court of Appeal reasonably determined that petitioner's contemplation of a state bar inquiry did not constitute an actual conflict of interest. Nevertheless, petitioner's contemplation/threat may be evidence of the breakdown of the attorney-client relationship. See *id.*

The record shows that, after an extensive hearing on the matter, the trial court implicitly rejected the possibility of a breakdown in the attorney-client relationship because, among other things, petitioner had not complained about Mr. Kirchick's performance before, Mr. Kirchick indicated that he was prepared to proceed to trial, and petitioner and Mr. Kirchick shook hands in open court towards the end of the hearing. The California Court of Appeal's determination that neither petitioner nor Mr. Kirchick demonstrated a breakdown in the attorney-client relationship was not an unreasonable application of controlling federal law. Cf. *Brown v. Craven,* 424 F.2d 1166, 1170 (9th Cir.1970) (sufficient evidence of irreconcilable conflict found where defendant was forced to trial with assistance of lawyer with whom he was dissatisfied, would not cooperate, and would not, in any manner whatsoever, communicate). Even if this court agreed with petitioner that there was a breakdown in the attorney-client relationship, "it is at least reasonable to conclude that there was not, which means that the state court's determination to that effect must stand." *Early v. Packer,* 537 U.S. 3, 123 S.Ct. 362, 366, 154 L.Ed.2d 263 (2002).

Petitioner is entitled to federal habeas relief on his Sixth Amendment claim of ineffective assistance of counsel based on a conflict if interest only if he can establish the "performance and prejudice" standard of *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See *Moore,* 159 F.3d at 1157 (petitioner must meet *Strickland* standard if there is only a possibility of conflict); see also *Schell v. Witek,* 218 F.3d 1017, 1028–29 (9th Cir.2000) (en banc) (if conflict did not rise to the level of a constructive denial of counsel, petitioner must prove he was prejudiced by the conflict). He does not. The record shows that Mr. Kirchick ably represented his client during trial, zealously presenting a defense and, contrary to petitioner's assertions, calling numerous witnesses who testified favorably on petitioner's behalf. Mr. Kirchick also effectively cross-examined the victims and brought to light much contradiction in their testimonies. In fact, Mr. Kirchick made this a close case by ably turning it into a credibility contest between petitioner and his victims. After a careful review of the record, it simply cannot be said that a conflict of interest prejudiced petitioner's defense. See *Strickland,* 466 U.S. at 687, 104 S.Ct.

2052. Or, put differently, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.[6]

In an attempt to bolster his Sixth Amendment claim, petitioner has presented for the first time a letter from Mr. Kirchick, dated February 27, 2001, in which Mr. Kirchick states that, as a result of the trial court's rulings at issue, he was "forced to trial with little or no time for proper preparation to include interviewing expert witnesses, family, friends, and other crucial information that was necessary at the time to assist my client more effectively." The letter does not demonstrate ineffective assistance of counsel. On September 12, 1996, Mr. Kirchick stated in open court that he was prepared to proceed to trial, and, after an independent review of the record, this court found that Mr. Kirchick then proceeded to represent his client ably at trial. That now, with the benefit of hindsight, Mr. Kirchick believes he could have done a better job if he had more time to prepare and present additional witnesses does not demonstrate that his performance was constitutionally deficient. See *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 ("every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time"); *Hendricks v. Calderon,* 70 F.3d 1032, 1040 (9th Cir.1995) ("hindsight is a weak standard for fixing constitutional minima"). Nor does the letter demonstrate prejudice. Petitioner's mere speculation that additional witnesses might have provided helpful information is not enough. See *Bragg v. Galaza,* 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir.2001).[7]

Petitioner is not entitled to federal habeas relief on his Sixth Amendment claim because the California courts' rejection of the claim was not contrary to, or involved an unreasonable application of, controlling federal law, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

### 2. Cumulative effect of trial errors

Petitioner claims that the state trial court committed several abuse of discretion errors which resulted in cumulative prejudice. Specifically, petitioner claims that the trial court (a) wrongly admitted evidence that petitioner dealt drugs and (b) wrongly admitted a close up photograph of the injuries to Mr. Garcia's head, and that the cumulative effect of these errors deprived him of a fair trial in violation of due process.

 In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of sev-

---

**6.** Nor can it be said that a conflict of interest actually affected the adequacy of petitioner's representation in the *Cuyler* sense. See, e.g., *United States v. Shwayder,* 312 F.3d 1109, 1180-20 (9th Cir.2002), amended, 320 F.3d 889 (9th Cir.2003) (actual conflict of interest did not adversely affect counsel's representation of defendant where record showed that counsel carried out type of representation defendant maintained counsel could not and did not carry out because of his conflict).

**7.** Petitioner's failure to present Mr. Kirchick's letter in support of his ineffectiveness claim at the state court level also appears to preclude habeas relief in federal court. See 28 U.S.C. § 2254(e)(2); *Baja v. Ducharme,* 187 F.3d 1075, 1078-79 (9th Cir.1999); see, e.g., *Bragg,* 242 F.3d at 1085 (court of appeals precluded from remanding case for an evidentiary hearing, despite concerns about gaps in the record, where petitioner failed to develop the factual basis for his claim in state court). It certainly is not a sufficient basis to entitle petitioner to an evidentiary hearing here. See *id.*

eral errors may prejudice a defendant so much that his conviction must be overturned. See *Thomas v. Hubbard,* 273 F.3d 1164, 1179–81 (9th Cir.2002) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. See *Mancuso v. Olivarez,* 292 F.3d 939, 957 (9th Cir.2002); *Fuller v. Roe,* 182 F.3d 699, 704 (9th Cir.1999); *Rupe v. Wood,* 93 F.3d 1434, 1445 (9th Cir.1996). The court accordingly will address the alleged errors individually, and then cumulatively.

### a. *Admission of evidence that petitioner sold drugs*

 During direct examination, Ms. Garcia described petitioner's erratic and threatening behavior after May 1995 and then unexpectedly said it was caused by his use of drugs. On cross-examination, Ms. Garcia testified that during that period, she became upset after finding notes containing women's names and telephone numbers. When asked whether she had ever seen petitioner use drugs, she said "no," but added that she had seen drugs in the refrigerator freezer. Given evidence of drugs and telephone numbers, the prosecutor, outside the presence of the jury, argued that petitioner had opened the door to the introduction of evidence that he sold drugs. Defense counsel objected, claiming such evidence was irrelevant and prejudicial. The court ruled the evidence admissible if the prosecutor laid a proper foundation.

On redirect, the prosecutor pursued the subject with Ms. Garcia. She testified that she had seen an "eight ball" and "multiple baggies" in the freezer. When asked if people came to the house, she responded, "Well, he wouldn't want to do business around there." Ms. Garcia further testified that once when defendant left the house, the baggies were gone, and he did not return with them. When asked if "[i]t was loose, not packaged up yet[,]" she said, "Yeah, sometimes they weren't broke down yet. They were all just—it wasn't broke down yet." Ms. Garcia further testified that on July 23, she did not see petitioner use drugs, but two unfamiliar people came to the house and went into the kitchen with petitioner. According to Ms. Garcia, however, petitioner generally did not bring people to the house. "Everything was taken care of outside the home away from the house except that one time I seen those people come."

On recross, Ms. Garcia admitted she did not really know what an "eight ball" was. She said petitioner also hid drugs in a box. She further said petitioner worked detailing cars and "slinging" or "selling" drugs and always had money. She admitted that she had never seen him sell drugs or anyone exchange money for drugs. However, she had been with petitioner when he made a "drop" at another's home. But she never went inside and did not know what happened there.

Officer Gary Marshall testified that on July 23, he searched petitioner's house. On cross-examination, he said he did not find any indicium of drug sales, for example, no scale, drugs, or mixing agents. On redirect, however, he said he found a pager and handwritten notes with the names "Sabrina," "Roberta," and "Zorro" and telephone numbers written on them. He explained that drug dealers often use pagers and commonly keep lists of their clients' first names and/or telephone numbers. On recross, Marshall admitted that possession of the pager and notes does not suggest that petitioner sold drugs. However, on redirect, over defense counsel's objection, Marshall was qualified as an expert on packaging and sale of methamphetamine and opined that if a person uses

drugs and has a pager, and if a cohabitant has seen that person with money, has found "eight balls" in the house, and has observed unfamiliar people coming to the house, then he would be "highly suspicious" and find a "very high possibility" that the drugs in the house were possessed for sale. On recross, Marshall admitted that the only indicia of drug sales he found in the house were the notes with names and numbers on them.

After Marshall testified, the court explained that although Marshall's testimony was "collateral," it was relevant to Ms. Garcia's credibility. It also noted that defense counsel had opened the door to evidence that defendant sold drugs.

The California Court of Appeal found that the trial court erred as a matter of state evidentiary law in admitting the evidence at issue—evidence that petitioner sold drugs—because the probative value of the evidence did not outweigh any prejudicial effect. *People v. Chaidez*, No. H016600, slip op. at 25–26 (Cal.Ct.App. Apr. 5, 2000). However, the court concluded that the error was harmless:

> Despite the discrepancies in Ms. Garcia's and her father's testimony about the events of July 23, their testimony, their injuries and defendant's inability to adequately explain them, the circumstantial evidence corroborating Ms. Garcia's testimony, and Ferry's expert testimony constituted overwhelming evidence of guilt.

> On the other hand, the evidence of drug dealing was sketchy and circumstantial and did not suggest that defendant was a major or professional drug dealer. Moreover, police found neither drugs nor evidence of drug sales in the house. Ms. Garcia never saw defendant sell drugs or exchange drugs for money when he allegedly made a "drop." Defendant's testimony that the names and numbers were of women he flirted with

was persuasive, and Ms. Garcia believed these women were the object of defendant's affection.

> Next, we note that the charges against defendant did not involve drug dealing, the challenged evidence had no tendency to prove the charges against him, and its brevity did not pose a substantial possibility of diverting the jury's attention from the crucial issues of fact. Moreover, the challenged evidence did not involve the use of violence or firearms and the particulars related by Ms. Garcia were not inflammatory. On the other hand, there was other highly inflammatory admissible evidence of defendant's involvement with illegal drugs. As noted, Ms. Garcia testified that defendant kept drugs in the house and used them, and he admitted regularly using methamphetamine between May and July 1995. Moreover, Ms. Garcia detailed defendant's acts of violence and attributed them to defendant's drug use. In light of this evidence, defendant's admitted philandering, and his prior conviction for assault with a deadly weapon, we do not believe the limited, relatively innocuous circumstantial evidence of drug dealing added much to the negative image of defendant [the] jury might have had.

> Last, we note that when the prosecutor addressed the issue of defendant's mental state and claim of voluntary intoxication during counsels' closing arguments, he did not mention the evidence of alleged drug dealing. Moreover, he expressly warned the jury not to convict defendant out of passion but because the evidence was overwhelming.

> In sum, therefore, we do not find it reasonably probable the jury would have returned a more favorable verdict on any count had the court excluded evidence that defendant sold drugs. (*People v. Watson* (1956) 46 Cal.2d 818, 836,

299 P.2d 243.) Defendant's arguments concerning the alleged closeness of the credibility contest between defendant and Ms. Garcia, the length of jury deliberations and its requests for readbacks and clarification instruction do not convince us otherwise.

*Id.* at 26–28. The state appellate court then explicitly rejected petitioner's federal claim: "Given our conclusion that the evidence was not unduly prejudicial, we reject defendant's claim that its admission rendered his trial fundamentally unfair, in violation of his federal constitutional right to due process." *Id.* at 28 n. 15.

The California Court of Appeal's rejection of petitioner's claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). The Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes." *Garceau v. Woodford,* 275 F.3d 769, 774 (9th Cir.2001). In fact, the Court has expressly declined to answer these questions. See *Estelle v. McGuire,* 502 U.S. 62, 75, 112 S.Ct. 475, 116 L.Ed.2d 385 n. 5 (1992) ("Because we need not reach the issue, we express no opinion on whether a state law would violate Due Process if it permitted the use of 'prior

crimes' evidence to show propensity to commit a charged crime."). Petitioner is therefore is precluded from federal habeas relief on his claim that the admission of evidence that he sold drugs violated his federal due process rights. See *Alvarado v. Hill,* 252 F.3d 1066, 1068–69 (9th Cir. 2001) (The question under § 2254(d) "is not whether [the conviction] violates due process as that concept might be extrapolated from the decisions of the Supreme Court. Rather, it is whether [the conviction] violates due process under 'clearly established' federal law, as already determined by the Court.").[8]

█ Even if the Ninth Circuit's more generous precedent applied here, petitioner's claim would fail. Under Ninth Circuit law, the admission of other crimes evidence violates due process if there were no permissible inferences the jury could have drawn from the evidence (in other words, no inference other than conduct in conformity therewith). See *McKinney v. Rees,* 993 F.2d 1378, 1384 (9th Cir.1993); *Jammal v. Van de Kamp,* 926 F.2d 918, 920 (9th Cir.1991). And even so, the evidence "must be of such quality as necessarily prevents a fair trial." *Id.* (citation and internal quotation marks omitted). That was not the case here. The evidence of drug dealing impeached petitioner's claim that he did not keep drugs in the house and, in view of all other properly admitted evidence, was not so highly inflammatory as to necessarily prevent a fair trial. See id.[9]

---

8. See, e.g., *Holgerson v. Knowles,* 309 F.3d 1200, 1203 (9th Cir.2002) (although Supreme Court has clearly established that retroactive increases in the scope of criminal liability by judicial construction are barred by the Due Process Clause, it has not clearly established that retroactive sentence enhancements by judicial construction also violate due process and therefore federal habeas relief on such a claim may no be had under § 2254).

9. *Garceau v. Woodford,* a pre-AEDPA case in which the Ninth Circuit found that an instruction permitting the jury to consider priors for purposes of establishing propensity violated due process, is distinguishable because in *Garceau* the prosecution's case was not strong, the "other crime" was the same crime for which defendant was on trial, and the evidence of the prior was emotionally charged. See *Garceau,* 275 F.3d at 775–76.

At minimum, it was reasonable for the California Court of Appeal to conclude that the admission of evidence that petitioner sold drugs did not render petitioner's trial fundamentally unfair in violation of due process, "which means that the state court's determination to that effect must stand." *Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 366, 154 L.Ed.2d 263 (2002).[10] Petitioner is not entitled to federal habeas relief on this claim.

### b. *Admission of close-up photograph of Mr. Garcia's injuries*

■ Pursuant to petitioner's pretrial motion to exclude "blood and gore photographs of victim," the trial court reviewed three photographs taken of Mr. Garcia's wounds. Exhibit 3A showed the wounds to Mr. Garcia's head. Exhibit 3B was a close-up of the same wounds. Exhibit 3C showed the wounds to Mr. Garcia's face and the left side of his head. The court found Exhibits 3A and 3B more probative than prejudicial and ruled them admissible. Defense counsel withdrew his objection to Exhibit 3C. Later, when Exhibit 3B was introduced, defense counsel renewed his objection and the court again rejected it.

The California Court of Appeal rejected petitioner's claim that Exhibit 3B should have been excluded because it was inflammatory and prejudicial:

> Even if we assume error, it was harmless. We do not find Exhibit 3B prejudicially more inflammatory than the other photographs of Mr. Garcia's head wounds. Thus, there is no reasonable probability that excluding the close-up would have resulted in a more favorable

verdict. (*People v. Watson, supra*, 46 Cal.2d at p. 836, 299 P.2d 243.)

*People v. Chaidez*, No. H016600, slip op. at 28 (Cal.Ct.App. Apr. 5, 2000) (footnote omitted). The state court's decision was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

The introduction of gruesome photographs does not by itself raise "the specter of fundamental unfairness such as to violate due process of law." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir.1997) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). The introduction of an additional photograph depicting Mr. Garcia's head wounds (albeit, a close-up) in the instant case does not compel a different conclusion. The photograph was probative as to the nature of the weapon used and the extent of injuries inflicted and, in view of other properly admitted evidence and the court's limiting instructions, it cannot be said that its admission rendered the trial fundamentally unfair in violation of due process. Accord *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465–66 (9th Cir.1986) (videotape of victim's autopsy, although unpleasant, not so inflammatory as to inject element of unfairness); *Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir.1982) (nude photographs of victim did not render trial fundamentally unfair in violation of due process).

Nor can it be said, after a careful review of the record, that the introduction of the additional photograph showing Mr. Garcia's head injuries, even if constitutional

---

**10.** Petitioner is also precluded from federal habeas relief because, after a careful review of the record, it cannot be said that the admission of evidence that petitioner sold drugs, even if constitutional error, had a substantial

and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

error, had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Petitioner is not entitled to federal habeas relief on this claim.

### c. *Cumulative prejudice*

The California Court of Appeal explicitly rejected petitioner's cumulative prejudice claim:

> "Defendant claims that cumulative error from admitting the photograph and evidence of drug dealing compels reversal. We disagree." (See *People v. Watson, supra,* 46 Cal.2d at p. 836, 299 P.2d 243.)

*People v. Chaidez*, No. H016600, slip op. at 28 n. 16 (Cal.Ct.App. Apr. 5, 2000). The state court's decision was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

The Ninth Circuit has held that the cumulative effect of several trial errors may prejudice a defendant so much that his conviction must be overturned, see *Thomas v. Hubbard*, 273 F.3d 1164, 1179–81 (9th Cir.2002);[11] however, it has also held that where, as here, there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation, see *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir.2002); *Fuller v. Roe,* 182 F.3d 699, 704 (9th Cir.1999); *Rupe v. Wood,* 93 F.3d 1434, 1445 (9th Cir.1996). Moreover, this is not one those exceeding-

ly rare cases in which the cumulative effect of the alleged trial errors so infected the trial with unfairness as to make the resulting conviction a denial of due process. Cf. *Thomas,* 273 F.3d at 1179–81 (reversing conviction based on cumulative prejudicial effect of (a) admission of triple hearsay statement providing only evidence that defendant had motive and access to murder weapon; (b) prosecutorial misconduct in disclosing to the jury that defendant had committed prior crime with use of firearm; and (c) truncation of defense cross-examination of police officer, which prevented defense from adducing evidence that someone else may have committed the crime and evidence casting doubt on credibility of main prosecution witness). Petitioner is not entitled to federal habeas relief on his claim of cumulative error/prejudice.[12]

### 3. *Failure to instruct on lesser-included offense*

■ Petitioner claims that the trial court violated his constitutional right to due process by failing to instruct the jury that it could find him guilty of attempted voluntary manslaughter as a lesser-included offense within the charged offense of attempted murder. According to petitioner, he was entitled to the instruction sua sponte because there was substantial evidence of (1) provocation and heat of passion and (2) an honest but unreasonable belief in the need for self-defense, and both circumstances negate the malice inherent in an attempted murder and reduce it to attempted voluntary manslaughter.

---

11. It is unclear whether the Ninth Circuit's holding is based on clearly established Supreme Court precedent. See *Alvarado v. Hill,* 252 F.3d 1066, 1068–69 (9th Cir.2001) (The question under § 2254(d) "is not whether [the conviction] violates due process as that concept might be extrapolated from the decisions of the Supreme Court. Rather, it is whether [the conviction] violates due process under

'clearly established' federal law, as already determined by the Court.")

12. Petitioner's additional claim that the trial court erred in failing to instruct the jury sua sponte on the lesser-included offense of attempted voluntary manslaughter does not compel a different result. See infra Section B.3 (discussing and rejecting claim).

The California Court of Appeal found that the trial court erred as a matter of state law in failing to instruct the jury on attempted voluntary manslaughter as a lesser-included offense within attempted murder because petitioner's testimony supported the instruction. *People v. Chaidez*, No. H016600, slip op. at 30–33 (Cal.Ct.App. Apr. 5, 2000). The court explained that, under California law, a trial court has a duty to instruct on a lesser-included offense sua sponte when there is substantial evidence to support, and that the duty arises " 'even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given.' " *Id.* at 29 (quoting *People v. Breverman*, 19 Cal.4th 142, 154, 77 Cal. Rptr.2d 870, 960 P.2d 1094 (1998)).[13] However, the court concluded that the error was harmless:

> Without resummarizing the evidence, it suffices to say that the Garcias' testimony and the circumstantial evidence concerning the events on July 23 represent overwhelming support for the jury's verdict of attempted murder.

In essence, the trial was a credibility contest between defendant and his victims. In this regard, we note that Ms. Garcia was a somewhat reluctant witness. The court had to issue a body attachment on the day Ms. Garcia was scheduled to testify. Then, when she first took the stand, she said that it was difficult to testify because she did not hate defendant and she wanted her children to have a father. She felt the prosecutor did not understand defendant's conduct in the context of their lengthy relationship and had overcharged him. She also said she changed her story in certain respects because she did not think defendant should have to face such a lengthy sentence if convicted. Ms. Garcia went on to recant previous accusations of rape and physical abuse. At times on cross-examination, she rebutted her direct testimony concerning the events of June 28. And she tried to distance herself and defendant from the letters found in her pillowcase that indicated his efforts to influence her testimony.

Nevertheless, as Ferry's expert testimony revealed, Ms. Garcia's conduct during her relationship with defendant and her equivocations, inconsistencies, recantations, and desire to protect him from the full consequences of his abuse were fully understandable as manifestations of battered women's syndrome. Moreover, Ms. Garcia did not recant her testimony that defendant physically abused her numerous times in a variety of ways between May 1995 and June 28, 1995. On direct, she testified that on June 28, defendant choked, hit, and sexually violated her. She testified that on July 23, defendant psychologically abused her, punched and choked her, poked her with scissors, hit her with a bat, and later attacked and stabbed her and her father with a sword. And, notwithstanding minor discrepancies, Mr. Garcia corroborated Ms. Garcia's testimony about the sword attack. Moreover, his injuries are consistent with and

**13.** Petitioner opted for an "all-or-nothing" type defense—the jury would believe either the prosecution's evidence of attempted murder and find that petitioner attacked Ms. Garcia and then her father with the sword and with the intent to kill both of them, or, alternatively, acquit petitioner of all charges, finding that Mr. Garcia initiated the attack and that petitioner never had control of the sword and did not personally stab either Ms. Garcia or Mr. Garcia. See *People v. Chaidez*, slip op at 32. The trial court nonetheless instructed on the lesser-included offense of assault with a deadly weapon, but not on the lesser-included offense of attempted voluntary manslaughter. See *id.* at 29 n. 17.

support their version of defendant's attack.

Defendant, on the other hand, admitted that he used drugs, suffered a prior conviction for assault with a deadly weapon, cheated on Ms. Garcia, and secretly eavesdropped on her. Except for the occasional push, shove, or choke, he denied that he ever physically or sexually abused or injured Ms. Garcia. Despite his admitted drug-induced paranoia, the argument with Ms. Garcia on June 23, his use of a hidden tape recorder, and his interest in the mortgage broker's business card, defendant denied that he was ever jealous of her. Moreover, as noted, defendant denied that he personally and intentionally used the sword to stab Ms. Garcia or Mr. Garcia, and, despite otherwise detailed recall of events, he did not know how either one was wounded. His testimony also fails to suggest why Mr. Garcia would ask a neighbor to call the police and then initiate a felonious attack with a deadly weapon. Finally, defendant denied trying to influence Ms. Garcia with his letters to her concerning her testimony at his trial.

Although the jury necessarily rejected some of Ms. Garcia's testimony, its verdict reveals that in general, it believed her and disbelieved defendant, finding him to be fundamentally not credible. In particular, the jury dismissed his blanket denials concerning acts against Ms. Garcia and convicted him of two rapes, forcible oral copulation, several acts of spousal abuse, dissuading Ms. Garcia from testifying, and attempting to kill both Ms. Garcia and Mr. Garcia with the sword. Moreover, with respect to Ms. Garcia, the jury found that he premeditated and deliberated before trying to kill her. That the jury could not reach a verdict on one rape charge merely reflects Ms. Garcia's uncertainty concerning whether they had intercourse two or three times.

Given the strength of the evidence of guilt and how the jury generally resolved the credibility contest between defendant and his victims, we do not consider it reasonably probable the jury would have opted for a middle-ground verdict of attempted voluntary manslaughter concerning either victim based on factual scenarios (heat of passion/imperfect self-defense) that neither party argued. (See *People v. Breverman, supra,* 19 Cal.4th at p. 174, 77 Cal.Rptr.2d 870, 960 P.2d 1094; *People v. Watson* [(1956) 46 Cal.2d 818, 836, 299 P.2d 243.]) The possibility of finding such a "middle ground" is, in our view, all the more remote because the jury did not have to decide between attempted murder and acquittal. As the People point out, the jury had the option of convicting defendant of assault with a deadly weapon. (See *People v. Lipscomb* (1993) 17 Cal.App.4th 564, 571, 21 Cal.Rptr.2d 445.)

*Id.* at 33–35 (footnote omitted).

The California Court of Appeal's rejection of petitioner's claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. See 28 USC § 2254(d). Although the Supreme Court has held that a failure to instruct on a lesser-included offense may be constitutional error in a capital case, *Beck v. Alabama,* 447 U.S. 625, 638, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), it has not extended this holding to non-capital cases. The Ninth Circuit accordingly has held that the failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim. See *Solis v. Garcia,* 219 F.3d 922, 929 (9th Cir.2000); *Windham v. Mer-*

*kle,* 163 F.3d 1092, 1105–06 (9th Cir.1998); *Turner v. Marshall,* 63 F.3d 807, 819 (9th Cir.1995), overruled on other grounds by *Tolbert v. Page,* 182 F.3d 677 (9th Cir. 1999) (en banc). Petitioner is precluded from federal habeas relief on his claim that the trial court failed to instruct sua sponte on the lesser-included offense of attempted voluntary manslaughter. See *id.*[14]

The Ninth Circuit has observed that a "defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule" that the failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim. *Solis,* 219 F.3d at 929 (citation omitted). Even if the Ninth Circuit's observation applied here, petitioner's claim would fail. As previously noted, petitioner opted for an "all-or-nothing" type defense—the jury would believe either the prosecution's evidence of attempted murder and find that petitioner attacked Ms. Garcia and then her father with the sword and with the intent to kill both of them, or, alternatively, acquit petitioner of all charges, finding that Mr. Garcia initiated the attack and that petitioner never had control of the sword and did not personally stab either Ms. Garcia or Mr. Garcia. The state trial court's failure to instruct sua sponte on the

lesser-included offense of attempted voluntary manslaughter did not implicate petitioner's right to adequate jury instructions on his theory of the case. Cf. *id.*[15]

Finally, petitioner is precluded from federal habeas relief on his instructional error claim because the California Court of Appeal's conclusion that the omission of the lesser-included instruction was harmless was not "objectively unreasonable." *Williams v. Taylor,* 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). It simply cannot be said that the omission of the instruction, even if constitutional error, had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

## CONCLUSION

After a careful review of the record and pertinent law, the court is satisfied that the petition for a writ of habeas corpus must be DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

---

**14.** That there is a split of authority in the circuits as to whether the *Beck* rule may be extended to non-capital cases only makes clear that there is no "clearly established" Supreme Court precedent at issue here. See *Alvarado v. Hill,* 252 F.3d 1066, 1068–69 (9th Cir.2001) (The question under § 2254(d) "is not whether [the conviction] violates due process as that concept might be extrapolated from the decisions of the Supreme Court. Rather, it is whether [the conviction] violates due process under 'clearly established' federal law, as already determined by the Court.").

**15.** It does not appear that the observation in *Solis*—that a defendant has a constitutional

right to adequate jury instructions on his theory of the case—is based on clearly established Supreme Court precedent, as required by 28 USC § 2254(d)(1). See, e.g., *Gilmore v. Taylor,* 508 U.S. 333, 343–44, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (rejecting claim that jury instructions violated defendant's constitutional right to a meaningful opportunity to present a defense because the cases in which Court has invoked this principle dealt either with the exclusion of evidence or the testimony of a defense witness; none of them involved restrictions on a defendant's ability to present an affirmative defense).